## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| JOHN DOE I, an individual proceeding by pseudonym; JOHN DOE II, an individual proceeding by pseudonym; and JOHN DOE III, an individual proceeding by pseudonym; | **CASE NO. 6:25-cv-219** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| PARVIZ SABETI, an individual; | |
| Defendant. | |

## **COMPLAINT**

## **INTRODUCTION**

1.    This is a civil action for compensatory and punitive damages against Parviz Sabeti ("Defendant Sabeti", "Sabeti" or "Defendant"), a top official with *Sāzmān-e Ettelā'āt va Amniyat-e Keshvar*[1] ("SAVAK"), an intelligence organization and the secret police of the government of Mohammad Reza Pahlavi, the former Shah of Iran (the "Shah"), for his role in Plaintiffs' torture.

---

[1] In English this translates to the "Intelligence and Security Organization of the Country and/or the Bureau for Intelligence and Security of the State."

2.     SAVAK was a participant in the *Komiteh Moshtarak* – the Joint Committee to Fight Terrorism or the Joint Anti-Sabotage Committee (the "Committee") – a task force created to combat terrorism and anti-state subversion, which in practice operated to control the public by detaining, torturing, and persecuting perceived political opponents of the Shah.

3.     All Plaintiffs were detained by members of SAVAK and/or the Committee for perceived crimes and tortured through beatings, whippings, stress positions, and more. Some Plaintiffs were electrocuted, hung by their wrists, forced to use the "Apollo" (a torture device reportedly invented by SAVAK), and/or had weights hung from their genitals.

4.     Plaintiffs were denied due process and proper trials, were convicted, and served time in prison as a result of their perceived political associations.

5.     Defendant is widely recognized as an architect of the institutionalization of torture in Iran, including the use of forced public recantations obtained through torture, a practice developed under his tenure and rapidly expanded and employed by the Islamic Republic of Iran today. By absorbing and adapting SAVAK, the Islamic Republic of Iran built upon and continued a legacy of torture and rule through terror developed by Defendant and the agency he served.

6.     At all relevant times, the Defendant planned, supervised and advocated for the arrest, detention and the extended torture of perceived political opponents of the Shah's repressive regime – frequently merely artists, writers, playwrights, and students – in violation of  laws against torture and crimes against humanity.  Defendant used violence and intimidation as a means of maintaining political power. Plaintiffs were among his many victims.

7.     On information and belief, Defendant has spent the last four decades out of the public eye, concealing his whereabouts and identity.  In 2023, mass demonstrations in Iran appeared poised to overthrow the Islamic Republic and spurred debates about the future of the country.  In this climate, Defendant reemerged in the public and political arena, including producing a seven and half hour documentary defending his tenure in SAVAK.

8.     Plaintiffs bring this action in pursuit of accountability denied to them by the regimes of the Shah and the Islamic Republic.

9.     Plaintiffs bring this action using pseudonyms due to fear of retaliation against themselves and their families by Defendant and his supporters as well as the current Iranian government which contains prior SAVAK members, engages in its own repression of political dissidents and, on information and belief, functionally continues the practices of SAVAK to this day.

10.     Continuing connections between Defendant, SAVAK, and the Islamic Republic of Iran have foreclosed any opportunities for justice or accountability for Plaintiffs inside Iran, and present credible threats to the safety of Plaintiffs both abroad, and in the United States.

11.     As Iranians and the broader international community are mobilizing against the Islamic Republic, there is a risk that the former Shah's government will be whitewashed and the abuses under his leadership forgotten.

12.     The former Shah's son, Prince Reza Pahlavi, and even Defendant Sabeti have been presented by Monarchists as the leaders who should replace the Islamic Republic.

13.     Plaintiffs reasonably fear the Monarchist movement may gain momentum and that the SAVAK may be restored as a security force in Iran, thereby foreclosing any chance of pursuing these claims during their lifetime.

14.     As a result, despite their continuing fear of reprisal, Plaintiffs have brought their claims now.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action based on 28 U.S.C. § 1350 and 28 U.S.C. § 1331.

16.    This Court has supplemental jurisdiction over Plaintiffs' state law claims based on 28 U.S.C. § 1367 because all the other claims are related to the claims with original jurisdiction and form part of the same case or controversy.

17.    This Court has personal jurisdiction over Defendant Sabeti, as he is a resident of this District.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3).

## PARTIES

### *Plaintiffs*

19.    Plaintiffs in this matter fear they and their families (both in the United States and in the Islamic Republic of Iran) are likely to suffer retaliation and further human rights abuses if their identities become public and thus are filing anonymously.  Their motion to proceed under pseudonyms is filed concurrently with this Complaint.

20.    Plaintiff John Doe I is a 72-year-old man currently residing in California.  On information and belief, Defendant Sabeti coordinated, approved, and ensured that he was detained and eventually subjected to arbitrary and prolonged detention and torture by SAVAK and the Committee.

21.    Plaintiff John Doe II is an 85-year-old man currently residing in California.  On information and belief, Defendant Sabeti coordinated, approved,

and ensured that he was detained and eventually subjected to arbitrary and prolonged detention and torture by SAVAK and the Committee.

22.    Plaintiff John Doe III is a 68-year-old man currently residing in California.  On information and belief, Defendant Sabeti coordinated, approved, and ensured that he was detained and eventually subjected to arbitrary and prolonged detention and torture by SAVAK and the Committee.


### *Defendant*

23.    On information and belief, Defendant is currently a resident of Orlando, Florida and is *sui juris*.

24.    Defendant is reported to have fled Iran in 1978.  On information and belief, Defendant Sabeti and his wife undertook active measures to conceal their identities and whereabouts after leaving Iran.

25.    It is currently unknown to Plaintiffs whether Defendant is a citizen or permanent resident of the United States.

26.    From 1972–1978, Defendant was a Deputy Director of SAVAK and head of SAVAK's Third Division, tasked with internal security.

27.    Defendant also served as Chairman for the *Komiteh Moshtarak*—the Joint Committee to Fight Terrorism or the Joint Anti-Sabotage Committee (the "Committee")—a multiagency task force that included SAVAK and was tasked

with the arrest and interrogation of dissidents and political opponents of the Shah's regime.

28. The main detention center operated by SAVAK in Tehran, where SAVAK's headquarters was located, is also referred to as both the Committee and the Committee Jail in various firsthand reports and historical sources. Where possible, Plaintiffs will refer to the "Committee Jail" when speaking of SAVAK's main detention center.

29. References to SAVAK's actions concerning political dissidents generally refer to the actions of SAVAK's Third Division, the most notorious division of SAVAK, which Defendant Sabeti controlled during his tenure as its head.

30. Defendant's influence and control over SAVAK's Third Division and over the Committee during the 1970s is well-documented.

31. Plaintiffs allege that Defendant Sabeti exercised responsibility over, commanded, conspired with, and aided and abetted subordinates in the Third Division and the Committee, to commit acts of torture; crimes against humanity; subject detainees (including Plaintiffs) to cruel, inhuman, or degrading treatment or punishment; arbitrary detentions, and cover ups to those abuses.

32. Accordingly, Plaintiffs assert that Defendant Sabeti is liable under domestic and international law for their injuries, including pain and suffering.

## STATEMENT OF FACTS

### *SAVAK and the Iranian Regime Under the Shah Mohammad Reza Pahlavi*

33.     Mohammad Reza Pahlavi ruled as the Shah of Iran from 1941 to 1979 (the "Shah").  He transitioned from a figurehead monarch to a dictator of an authoritarian regime with absolute power following the 1953 coup of Prime Minister Mohammad Mossadegh.  From 1953 to 1979, Pahlavi instituted authoritarian rule in Iran, limiting civil and political freedoms, instituting one party rule, and establishing a national secret police known as the *Sāzmān-e Ettelā'āt va Amniyat-e Keshvar* ("SAVAK").

34.     SAVAK functioned both as an intelligence agency and security force, with functionally unlimited power to censor the media, screen applicants for government jobs, and use all means necessary to hunt down and persecute dissidents.  SAVAK played the role of  police, prosecutor, and magistrate in Iran, as recognized by the U.S. Department of State.

35.     Throughout the 1970s, SAVAK committed gross human rights abuses against political dissidents throughout the country.  This included the systematic use of torture, arbitrary and prolonged executions, and extrajudicial killings.  This deliberate reign of state terror reached its peak during Defendant's tenure as Chief of SAVAK's Third Division, from 1972 to 1978 as a direct result of Defendant's actions as chief.

36.    During its reign, SAVAK was responsible for the mass arrest and torture of thousands of perceived political opponents, including lawyers, writers, theater directors, university teachers, members of ethnic minority groups, intellectuals, students, activists, artists, and political rivals. SAVAK carried out arrests without judicial oversight, and detainees were not informed of charges against them, as required by law. Many perceived political opponents of the Shah were executed by SAVAK members during the 1970s.

37.    SAVAK's surveillance activities extended abroad, including to the United States, and is reported to have included the intimidation of students and influence operations targeting United States policymakers.

38.    In response to opposition to the Shah's regime, the Joint Anti-Sabotage Committee (the "Committee") was established in 1972, directed by the Third Division of SAVAK. The Committee, which Defendant led, was a multiagency task force that included SAVAK, the military, the local police and the gendarmerie. A majority of its employees were members of SAVAK.

39.    The Committee was tasked with identifying potential threats to the regime and initiated a broad campaign to arrest and interrogate anyone perceived to be associated with opposition to the Shah.

40.    This shift included the development of specific torture techniques associated with the Committee. As Ervand Abrahamian documents: "Brute force

was supplemented with the bastinado; sleep deprivation; extensive solitary confinement; glaring searchlights; standing in one place for hours on end; nail extractions; snakes (favored for use with women); electrical shocks with cattle prods, often into the rectum; cigarette burns; sitting on hot grills; acid dripped into nostrils; near-drownings; mock executions; and an electric chair with a large metal mask to muffle screams while amplifying them for the victim.  This latter contraption was dubbed the Apollo—an allusion to the American space capsules.  Prisoners were also humiliated by being raped, urinated on, and forced to stand naked."[2]

41.    Individuals arrested by the Committee were taken to facilities controlled by the Committee and interrogated under torture.  This process would often result in the subsequent arrest and interrogation of individuals and associates whose names were divulged under torture.

42.    On information and belief, the Central Headquarters of the Committee were located in Tehran at the Committee Jail.  On information and belief, Defendant retained an office in this headquarters.

43.    Defendant is referred to by historians as the "de facto leader" of the Committee, despite the existence of a nominal head from the ranks of the military.

---

[2] ERVAND ABRAHAMIAN, TORTURED CONFESSIONS PRISONS AND PUBLIC RECANTATIONS IN MODERN IRAN 106 (1999).

As one international NGO has noted: "As a practical matter, most political arrests are made by decision of the Joint Committee of the National Police Force and the SAVAK. This Committee, presided over by the much feared chairman Sabeti, is the main investigative committee for internal security. It decides most cases and acts as sort of a clearing house receiving information from other security sources in the government and the Army."[3]

44.    SAVAK was wholly responsible for "investigating" detainees and preparing the prosecutor's case for trial, without any independent oversight, thus effectively serving as the police, prosecutor, and magistrate.

45.    Trials, including those of Plaintiffs, were conducted in a summary procedure at military tribunals, without adequate evidentiary showings or relying on evidence obtained through torture, without adequate legal representation for the defendant or opportunities to present a defense, and with limited opportunities for public observation.

46.    Detainees, including Plaintiffs, were not granted access to lawyers in detention, and they were regularly held incommunicado for prolonged periods, until their trial or release.

---

[3] William J. Butler, Esq., *Report on Human Rights in Iran*, in HUMAN RIGHTS AND THE LEGAL SYSTEM IN IRAN 1, 20 (1976).

### *Defendant's Role in Detaining and Torturing Civilians*

47.     On information and belief, at all relevant times Defendant Sabeti possessed and exercised effective command and control over the security apparatus of Iran, including the Third Division of SAVAK and the Committee, and approved the torture of thousands of Iranian citizens including Plaintiffs.

48.     Defendant began his career with SAVAK in 1959, working as a security analyst within the Third Division which was responsible for internal security.

49.     In 1964, Defendant was appointed as a National Security Advisor to the Prime Minister.

50.     By 1972, Defendant had ascended to the head of the Third Division and was a Deputy Director of SAVAK.  In this position, Sabeti reported to General Ne'matollah Nasiri, the head of SAVAK, who reported directly to the Shah.

51.     In or around this time, Defendant was also the Chairperson and de facto head of the Committee.

52.     During his tenure, Defendant was widely recognized as one of the most powerful and feared men in the Shah's regime, commanding both intelligence and security personnel, and overseeing the operations of a multi-agency committee with the authority to apprehend, interrogate and prosecute opponents throughout the country.

53.    For example, a CIA document entitled "Iran After the Shah" lists Sabeti as one of the most powerful men in Iran and a potential successor should there be a transition.[4]

54.    Defendant's high position within the Shah's security apparatus entitled him to supervise the arrest, detention, and treatment of the political prisoners.

55.    During the relevant period, subordinates were expected to follow without question the instructions of superiors, including Defendant Sabeti.

56.    Defendant's term with SAVAK's Third Division and Committee, was characterized by the brutal treatment of dissidents and opponents, the systematic use of torture at facilities run by the Committee, and the use of torture to obtain forced recantation from dissidents.

57.    Defendant directed the actions of SAVAK agents, within both the Third Division and the Committee, responsible for the surveillance and targeting of dissidents inside the country and abroad.

58.    Defendant's authority is exhibited by then-top secret cables sent to Iranian consulates and embassies directing SAVAK personnel abroad. The cables signed by Defendant direct SAVAK personnel to intensify divisions between

---

[4] NAT'L FOREIGN ASSESSMENT CENTER, CENTRAL INTELLIGENCE AGENCY, IRAN AFTER THE SHAH 16 (August 1978) (approved for release Feb. 15, 2018), https://www.cia.gov/readingroom/docs/iran%20after%20the%20shah%5B15401076%5D.pdf.

student groups abroad, "by all possible means with an aim to provoking some severe actions against each other."[5]  Additional cables signed by Defendant reportedly included operational directives with respect to breaking into the homes of targets, and noting that such plans would require approval by SAVAK headquarters before execution.[6]

59.    As part of Defendant's authority in SAVAK and the Committee, he supervised the arrest, detention, and treatment of political prisoners.

60.    Defendant has admitted in a documentary, various interviews, and his own memoir to playing a leading role in the first international assassination abroad by SAVAK, coordinating the operation to assassinate Teymour Bakhtiar in Iraq in 1970.

61.    On information and belief, Defendant personally directed and supervised the interrogators involved in the interrogation and torture of Plaintiffs, including Mohammad Ali Shabani (alias Hosseini ), Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Armanm, and Deghan.

62.    On information and belief, Defendant was aware of and approved the use of torture within Committee facilities and by SAVAK personnel.  On

---

[5] Gregory F. Rose, *The Shah's Secret Police Are Here*, New York, Sept. 18, 1978 at 45-51, 48 (released by CIA May 24, 2004), https://www.cia.gov/readingroom/docs/CIA-RDP81M00980R000600050015-5.pdf.
[6] *Id.*

information and belief, Defendant oversaw a vast network of intelligence and information collection that provided him with specific reports on Committee facilities and the status of detainees, including their inhumane treatment. On information and belief, Defendant instructed subordinates to torture detainees.

63.    Defendant commented on torture techniques used against dissidents during interviews with foreign press conducted during the Shah's authoritarian regime.

64.    Over the decades, Defendant Sabeti's personal knowledge of and involvement in the inhumane and illegal treatment of detainees has repeatedly come to light.

65.    Iranian actor Behrouz Vossoughi reported that Sabeti personally threatened to arrange for his murder, and the cover up thereof, following his role in the film *Gavaznha* [The Deer].[7]

66.    Sabeti has previously been accused of directly participating in the interrogation and torture of political dissidents. Mehdi Rezai, a political prisoner, recounted his torture by SAVAK in open court and accused Sabeti of having urinated in his mouth. Audio recordings of Rezai's trial and his statements in court made headlines in Iran and have recently resurfaced online.

---

[7] MASOUD KAZEMZADEH, MASS PROTESTS IN IRAN: FROM RESISTANCE TO OVERTHROW 184 (De Gruyter Contemporary Social Sciences Vol. 38, 2023).

67.    Kourosh Lasha'i was arrested by SAVAK in 1972 as a Marxist militant and tortured until he agreed to provide a televised interview recanting his beliefs. Such interviews were reportedly the goal of some detainee's torture and became known as a hallmark of the Shah's regime. In his memoirs, Lashai' notes that Sabeti personally visited him in prison to discuss the interview.

68.    In 1976, the Shah enacted a series of policy challenges based on pressure from the Carter administration to improve the human rights situation inside the country. This included ending the use of torture, releasing certain political prisoners and opening the countries prisons and courts to international human rights organizations including the Red Cross.

69.    Defendant publicly vehemently opposed these decisions. When an official asked Sabeti how they should respond to human rights groups, Sabeti is reported to have responded, "Hell with the human rights group."[8]  Sabeti has stated in his memoirs that dissidents should have been dealt with seriously and severely.

70.    On information and belief, Defendant Parviz Sabeti was the chief torturer of the Shah's authoritarian regime. On information and belief, all the torture teams of the police, the Committee, and the SAVAK were under Defendant's control and they all carried out his direct commands.

---

[8] ABBAS MILANI, EMINENT PERSIANS: THE MEN AND WOMEN WHO MADE MODERN IRAN, 1941-1979, 291 (2008).

71.    During the entire period that Defendant Sabeti was overseeing and encouraging the regular use of torture, use of torture by government officials was specifically prohibited by the Iranian penal code.

### *Plaintiffs' Arrests and Torture*

### <u>John Doe I</u>

72.    In 1974, Plaintiff John Doe I was a student at Tabriz University. During his time at Tabriz University, he was active in peaceful student demonstrations against the Shah.

73.    In or about January 1974, John Doe I was arrested by SAVAK in his dormitory and transferred first to a SAVAK building in Tabriz and then to the Committee Jail in Tehran.

74.    Upon arrival at the Committee Jail, John Doe I was beaten and interrogated and forced to provide written statements on his political associations and activities. Each time John Doe I provided a written statement he was accused of not disclosing everything he knew and was subjected to torture by his SAVAK interrogators including Mohammad Ali Shabani (alias Hosseini). John Doe I's interrogators were employed by SAVAK and worked in the Committee jail.

75.    John Doe I was tortured repeatedly and told to provide the names of individuals he was involved with. After multiple interrogations and weeks of

torture, SAVAK brought in another classmate of John Doe I who stated that John Doe I had provided him with a book of political poetry.

76.    Despite never being part of any organized group, or taking part in any guerilla activities, John Doe I was repeatedly tortured and threatened with death. He was tortured through beatings, whipping of his feet and hands, electrocution (including of his genitals) and stress positions. John Doe I was also tortured using the "Apollo", a torture device reportedly invented by SAVAK which consisted of an electric chair with a metal mask designed to amplify the screams of the victims in their own ears.

77.    On information and belief, Defendant Sabeti coordinated, approved, and was the essential means through which John Doe I was detained and subjected to arbitrary and prolonged detention and torture by SAVAK and the Committee.

78.    John Doe I was detained for approximately 40 days before being sent to Qasr prison. At Qasr prison, he was taken before a military tribunal and charged with acting against national security, and sentenced to four years in prison, which he served primarily in Qasr Prison.

79.    John Doe I still experiences trauma and stress when recounting his torture. He has lived with the physical and emotional scars of what he went through for decades.

80.    He has suffered from kidney issues throughout his life as a result of the wounds and infections that he suffered while in prison.  John Doe I still has the scars from being whipped and lashed.  He has hidden these scars, and many of the details of what happened to him, from people throughout my life.

### John Doe II

81.    Plaintiff John Doe II was an Iranian artist and part of an artistic group shut down by SAVAK.  SAVAK arrested John Doe II several times during the 1970s.

82.    In or about 1970, John Doe II was arrested for his activities in support of free speech in Iran. He was sentenced to two months imprisonment.  In or about 1971, John Doe II was detained by SAVAK and questioned about his associations with dissidents in Iran.  John Doe II was interrogated and held for a month before being released.

83.    In or about 1972, John Doe II was arrested at his home in Tehran by members of SAVAK.  He was transferred to the Committee Jail in Tehran.  Upon arrival John Doe II was beaten by members of the Committee.  He was repeatedly interrogated and tortured.

84.    During his torture John Doe II was informed that an individual who he had loaned a book to had been involved in a group that was charged with

participating in armed struggle. Based on this association he was charged with acting against national security.

85.   After a month in the Committee Jail, he was transferred to Qasr Prison and sentenced to one year of imprisonment by a military tribunal.

86.   In or about 1974, John Doe II was again arrested along with other members of an artistic group and taken to the Committee jail in Tehran. They were targeted based on their political views as part of a broader censorship campaign aimed at silencing dissidents with socialist tendencies.

87.   John Doe II spent several months in the Committee Jail where he was tortured and interrogated by SAVAK and was denied access to adequate medical care.

88.   During his time in the Committee Jail he was tortured by SAVAK and Committee employees including Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Mohammad Ali Shabani (alias Hosseini) and Shaheen. John Doe II was tortured with stress positions, beatings, whipping, and being hung by the wrists.

89.   On information and belief, Defendant Sabeti coordinated, approved, and was the essential means through which John Doe II was detained and subjected to arbitrary and prolonged detention and torture by SAVAK and the Committee.

90.    John Doe II was eventually sent to trial at a military court, represented by an appointed military attorney who did not assist him in presenting a defense but instead encouraged him to admit wrongdoing and seek forgiveness.

91.    John Doe II was convicted and sentenced to 12 years in prison.  He served seven years of his prison sentence, primarily in Qasr Prison. Other members of the group were also arrested and received sentences of 1–12 years imprisonment.

92.    John Doe II's torture has left a deep and heavy psychological burden on him, where every day is its own struggle.  To help deal with the lasting effects of his torture, John Doe II has had years of therapy.

93.    Even thinking about his torture is a visceral and painful process for him.  At times, John Doe II has post-traumatic stress reactions when he tries to talk about his torture, including full body shakes and feelings of dizziness.

### John Doe III

94.    Plaintiff John Doe III was only a high school student when he was arrested and tortured by members of the Committee.

95.    In or about April of 1975, John Doe III was arrested by members of SAVAK as well as military personnel and was taken to the Committee building located in his hometown of Shiraz.  There he was interrogated and tortured by two members of the Committee, Arman and Deghan.

96.    John Doe III was arrested because three of his classmates were arrested previously and gave his name as a contact, presumably while under torture. He was accused of being part of a group of students who shared literature and had anti-Shah views. One of these students had made a homemade gun used to shoot birds. As a result, they were charged with participating in an armed group.

97.    Torture methods inflicted on John Doe III included stress positions, beatings, whipping, electrical shocks, being hung from the ceiling by his handcuffed wrists, and having weights hung from his genitals.

98.    On information and belief, Defendant Sabeti coordinated, approved, and was the essential means through which John Doe III was detained and subjected to arbitrary and prolonged detention and torture by SAVAK and the Committee.

99.    After about a week of interrogation, John Doe III was transferred to Adel Abad prison in Shiraz and held in solitary confinement for around two months before being sent to a military tribunal. He was convicted of conspiring to act against national security and sentenced to two years of imprisonment. He served two years and four months before being released.

100.   Recounting and reliving his torture is difficult for John Doe III; it can feel dishonorable and humiliating.  His trauma has left a heavy burden on him for his entire life, although he has tried his best to cope.

### Defendant's Liability

101.   Defendant, together with other members/employees of SAVAK and the Committee – including but not limited to Mohammad Ali Shabani (alias Hosseini), Manouchehr Vazifekhah (alias Manouchehri), and Mohammad Hassan Nasseri (alias Azodi) – agreed that SAVAK and other elements of the Iranian security would use unlawful torture and terror to suppress opposition to the Shah's regime.

102.   Members/employees of SAVAK and the Committee including but not limited to Mohammad Ali Shabani (alias Hosseini), Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Armanm, and Deghan acted as agents of Defendant and his coconspirators.

103.   The members of the security forces who detained and tortured Plaintiffs were acting as Defendant's agents under Defendant's policies, orders, and instruction.

104.   Defendant's agreement with others including Mohammad Ali Shabani (alias Hosseini), Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Armanm, and Deghan to suppress civilian opposition

to the Shah through violence led to the torture of Plaintiffs and the deaths and torture of civilians, including Plaintiffs.

105.   By virtue of his positions and head of SAVAK's Third Division and chairman of the Committee, Defendant had a superior-subordinate relationship over members/employees of SAVAK and the Committee.  By virtue of his positions, Defendant planned for and gave orders for the detention, use of torture and other abuses of those detained.

106.   Given the hierarchical nature these organizations, and the culture of terror imposed by the Shah's authoritarian regime, these members/employees and agents would have been compelled to follow Sabeti's direction or orders and torture and otherwise abuse Plaintiffs and others, lest they face the same treatment.

107.   Based on his own public statements and those of others involved in the regime, Defendant Sabeti not only had knowledge of the pervasive use of torture applied on behalf of the Shah's regime, but was a main advocate for its application.

### Concealment of Defendant Sabeti's Identity and Whereabouts Outside of Iran

108.   Defendant Sabeti's long-term concealment tactics—which on information and belief include the use of alternate names and involvement of family members in business dealings—have hindered Plaintiffs' ability to bring their claims against him.

109.   Iranian historians have noted that the Defendant Sabeti "is hidden under a heavy fog of rumor, gossip, innuendo, rightful criticism, and calculated disinformation" even stating that "[s]ome say he lives incognito in Israel."[9]

110.   On information and belief, both Defendant Sabeti and his wife used various aliases with respect to their first and last names while living in the United States in an effort to conceal their identity and whereabouts.  On information and belief, Defendant Sabeti even obtained power of attorney from numerous individuals in order to conduct business transactions under names not his own, thereby further concealing his identity.

111.   After leaving Iran in 1978, Defendant's identity was the subject of rumor in the Iranian community until February 11, 2023 when a photo of Defendant publicly appearing in the United States was posted on the social media network Twitter, now rebranded as X.

112.   The publication of Defendant's image solicited shock among the Iranian diaspora as it had not previously been widely known among the community that Defendant Sabeti was residing in the United States.  The post went viral in the Iranian community, eliciting more than 1 million views and more than 1,000 comments.

---

[9] ABBAS MILANI, EMINENT PERSIANS: THE MEN AND WOMEN WHO MADE MODERN IRAN 292 (2008).

113.    Following this event Defendant for the first time appeared on television in a five-part documentary detailing his life.  Shortly after this interview aired, a YouTube channel entitled "Timeline Iran" published an interview with from Sabeti in 2014 and noted that he had asked for his face not to be shown at the time, but has since made several public appearances.  Prior to these events, Sabeti had concealed his whereabouts.

114.    Defendant's public appearance in the United States finally allowed Plaintiffs the opportunity to even consider pursuing claims against Defendant for his role in the crimes committed against them and precipitated this legal action.

### *Absence of Available Remedies in Iran*

115.    There is no adequate remedy available in Iran to Plaintiffs for the claims asserted here.  Plaintiffs have been denied access to justice due to the repressive authoritarian regimes that have controlled Iran, regimes that have not only failed to provide accountability for human rights abuses but have actively targeted individuals who oppose them.

116.    Upon the removal of the Shah from power in 1979, the newly formed Islamic Republic of Iran took apprehended some members of the former regime, including some high-ranking officials associated with SAVAK.  However, on information and belief, rather than eliminating SAVAK, the Islamic Republic

effectively rebranded it as a new security entity *Sazman-E Ettela'at Va Amniat-E Melli-E Iran* ("SAVAMA").

117.   On information and belief, SAVAMA was to serve essentially the same purpose as SAVAK –  to stop the proliferation of opposition organizations in Iran and acquire intelligence on Iraq by employing the experienced ex-intelligence officers of SAVAK and the military.

118.   On information and belief, SAVAMA contained many of the same staff members and senior leaders as SAVAK, thereby functionally continuing SAVAK's reign of terror.  The appointment of General Hossein Fardust, a former Deputy Director for SAVAK, as the head of SAVAMA exemplifies the collaboration between former SAVAK personnel and the Islamic Republic.

119.   Moreover, on information and belief, members of SAVAK were also integrated into Iran's intelligence system.

120.   On information and belief, the Islamic Republic has adopted policies pioneered by SAVAK and the Defendant, including assassination of dissidents abroad, the use of torture to obtain confessions, and the brutal suppression of dissent inside and outside the country.

121.   The Islamic Republic has continued SAVAK's policy of repression, censorship, torture and executions.  It is well documented that the Islamic Republic has perpetrated the same abuses as SAVAK: many political dissidents and activists

in Iran continue to be improperly detained; tortured; subjected to various cruel, inhumane, or degrading treatment; and convicted through sham trials. The use of violence and intimidation by the Islamic Republic and its supporters against Iranian political dissidents and activists abroad has been well documented. On information and belief, the Islamic Republic has assassinated some such dissidents abroad.

122.   SAVAK and the Islamic Republic have also historically targeted many of the same elements in Iranian society: ethnic and religious minorities fighting for their rights, intellectuals, artists, and dissidents with liberal viewpoints.

123.   As a result, Plaintiffs cannot bring the claims asserted here in Iran.

### *Ongoing Threats to Plaintiffs Safety*

124.   Plaintiffs contend that both the regime of the Shah and the Islamic Republic have maintained a pattern of judicial repression, targeted violence, and surveillance both inside and outside Iran.

125.   On information and belief, during the entirety of its existence since 1979, the Islamic Republic of Iran has carried out an aggressive campaign of assassinations against dissidents abroad.

126.   On information and belief, Iranian human rights activists have been murdered at the direction of the Islamic Republic in various European capitals, including Geneva and Vienna. As recently as October of 2024, Federal

Prosecutors charged a military official with the Islamic Revolutionary Guard Corps of Iran ("IRGC") and three others with links to that government with plotting to assassinate an Iranian-American journalist in New York.

127.   Plaintiffs' pursuit of accountability against security officials involved in torture and repression makes them a target for Iranian security forces operating with impunity at present in Iran.  This potential threat is heightened by ongoing collaboration between certain elements of the IRGC and the supporters of the Monarchy in exile.

128.   The Iranian government has also conducted targeted campaigns of influence and intimidation among the Iranian diaspora, fostering a pervasive climate of fear that has hindered Plaintiffs' ability to come forward.

129.   Plaintiffs' fear of reprisal, from the Islamic Republic or factions of the monarchy sympathetic to SAVAK, is reasonable and well-founded.

130.   Reza Pahlavi, the son of the former Shah is the leader of the Monarchist faction of Iranians.  During the last several years Mr. Pahlavi has been accused by members of the Iranian diaspora of collaborating with elements within the Islamic Revolutionary Guard Corps ("IRGC") (a branch of the Iranian Armed Forces) and promising members of Iran's security forces amnesty in exchange for collaboration.

131.   In a 2017 interview with the Israeli channel i24, Reza Pahlavi said: "The most important component of this [regime] change would be the tacit cooperation of the existing military and paramilitary forces."[10]

132.   Pahlavi has gone on to state in numerous interviews that he is willing to provide security forces within the current regime a "guarantee of survival" in order to obtain their cooperation.[11]

133.   Pahlavi has further made public statements claiming that he is in communication and dialogue with elements of the IRGC.  Pahlavi has also "advocated for national reconciliation efforts to reintroduce low and mid-level members of the Ayatollahs' apparatus into any post-transition society."[12]

134.   In a 2019 interview with Voice of America Persian Service, Pahlavi appealed to security elements within the military, and IRGC, and claimed that "they are the ones who will inherit the future Iran."[13]

135.   Elements within the Monarchist movement in the United States and Europe have expressed hostility towards pro-democracy opposition groups that call

---

[10] Himdad Mustafa, *The Iranian Monarchists Do Not Represent The 'Multinational Iran'*, MEMRI (Jan. 30, 2023), Daily Brief No. 452, https://www.memri.org/reports/iranian-monarchists-do-not-represent-multinational-iran.
[11] Transcript, *Forty Years of the Islamic Republic: What Next?*, WASHINGTON INSTITUTE POLICY FORUM (Dec. 14, 2018), https://www.washingtoninstitute.org/media/1225.
[12] Alireza Nader, *Exiled Iranian Crown Prince Reza Pahlavi operates like a statesman*, NEW YORK POST (May 6, 2023), https://nypost.com/2023/05/06/exiled-reza-pahlavi-operating-like-seasoned-statesman/.
[13] https://www.youtube.com/watch?v=Epv_erSjK7U (last visited Feb. 9, 2025).

for the establishment of a democratic Republic in Iran. They have disrupted the speeches of opposition figures and demanded that they profess "Long Live the Shah" in their speeches.

136.    Iranian Political Scientist Masoud Kazemzadeh notes, "Since at least 1984, I have observed on numerous occasions monarchists disrupt, threaten, and use violence against liberals, democrats, and leftists in protests in Los Angeles. On many occasions, the Los Angeles police had to intervene and take them away."[14]

137.    Since 2022, Monarchists have been involved in several violent incidents in Iranian protests including sexual assaults and the beating of perceived opponents.

138.    On information and belief, Defendant Sabeti has been involved with Iranians seeking to restore the Monarchy to Iran. His daughter is on the advisory council for The National Union for Democracy in Iran, an organization affiliated with the Monarchist movement in the United States. On information and belief, Defendant Sabeti is reported to have served as a "chief advisor" to Reza Pahlavi, the son of the late Shah of Iran.[15]

139.    During the last decade, on information and belief, Defendant has also been associated with individuals that have alleged ties to the IRGC. The

---

[14] MASOUD KAZEMZADEH, MASS PROTESTS IN IRAN: FROM RESISTANCE TO OVERTHROW 191 (De Gruyter Contemporary Social Sciences Vol. 38, 2023).
[15] ABBAS MILANI, EMINENT PERSIANS: THE MEN AND WOMEN WHO MADE MODERN IRAN, 1941-1979 285 (2008).

collaboration between Defendant and individuals affiliated with the IRGC provides a reasonable basis for fear by Plaintiffs who are ordinary Iranian dissidents residing abroad.

140.   On information and belief, Defendant was also involved in arms procurement for the Islamic Republic during the Iran Contra scandal.

141.   While Plaintiffs do not feel that they are currently pursuing their claims without fear, they feel that they can no longer wait until such time.

## CAUSES OF ACTION

142.   Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions, and treaties:

      a.     Alien Tort Claims Act, 28 U.S.C. § 1350;

      b.     Torture Victim Protection Act, 28 U.S.C. § 1350;

      c.     Customary International Law;

      d.     Charter of the United Nations (1945) 59 Stat. 1031, T.S. 993, 3 Bevans 1153;

      e.     Universal Declaration of Human Rights (1948) G.A. res. 217A (III), U.N. Doc A/810 at 71;

      f.     International Covenant on Civil and Political Rights (1966) G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316, 999 U.N.T.S. 171;

g.      Declaration on the Protection of All Persons From Being
Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment (1976) G.A. res. 3452, 30 U.N. Doc, GAOR Supp. (No. 34) at 91,
U.N. Doc. A/10034;

h.      Convention against Torture and Other Cruel, Inhuman, or
Degrading Treatment or Punishment (1984) G.A. res. 39/46, annex, 39 U.N.
GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51;

i.      Common law of the State of Florida, including but not limited
to assault and battery, negligence, intentional infliction of emotional distress,
negligent infliction of emotional distress, and civil conspiracy.

## COUNT I

### Violation of the Torture Victims Protection Act – Torture
### 28 U.S.C. § 1350
### (*All Plaintiffs Against Defendant Sabeti*)

143.   The allegations set forth in the above paragraphs are re-alleged and
reincorporated by reference as if fully set forth below.

144.   Plaintiffs suffered from cruel, inhuman or degrading treatment and
severe pain and suffering inflicted knowingly, deliberately, and intentionally for
purposes which included, among others, obtaining information, punishing
Plaintiffs, and intimidating or coercing Plaintiffs.

145.   Such conduct constitutes torture and was in violation of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note.

146.   Plaintiffs suffered severe mental and physical injuries as a result of the torture inflicted while in custody.  Plaintiffs were put in great fear for their lives and their suffering continues to this day.

147.   Plaintiffs' torture was carried out by Defendant's orders and under Defendant's supervision, by acting with the implicit sanction of the state under actual or apparent authority, or color of law, of Iran under the administration of Mohammad Reza Pahlavi.

148.   Defendant Parviz Sabeti is liable for Plaintiffs' injuries because he provided knowing, substantial assistance to the direct perpetrators, and/or because the direct perpetrators were agents, and/or employees of Defendant and operated under Defendant's instruction and control.  Defendant knowingly and intentionally aided and abetted or entered into a conspiracy or joint criminal enterprise with SAVAK and its officers/members in the unlawful conduct that led to the torture Plaintiffs endured as a result of the policies enacted by Defendant on behalf of the Shah's regime.

149.   By reason of Defendant's violation of TVPA, Plaintiffs have the private right of action against Defendants pursuant to 28 U.S.C. § 1350.

150.   Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT II

### VIOLATION OF THE ALIEN TORT CLAIMS ACT – TORTURE
### 28 U.S.C. § 1350
### (*All Plaintiffs Against Defendant Sabeti*)

151.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

152.   Plaintiffs suffered from cruel, inhuman or degrading treatment and severe pain and suffering inflicted knowingly, deliberately, and intentionally for purposes which included, among others, obtaining information, punishing Plaintiffs, and intimidating or coercing Plaintiffs.

153.   Such conduct constitutes torture in violation of international law, violation of the laws of Iran, and violation of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350 note.

154.   Plaintiffs suffered severe mental and physical injuries as a result of the torture inflicted while in custody.  Plaintiffs were put in great fear for their lives and their suffering continues to this day.

155.   Plaintiffs' torture was carried out by Defendant's orders and under Defendant's supervision, by acting with the implicit sanction of the state under

actual or apparent authority, or color of law, of Iran under the administration of Mohammad Reza Pahlavi.

156.    Defendant Parviz Sabeti is liable for Plaintiffs' injuries because he provided knowing, substantial assistance to the direct perpetrators, and/or because the direct perpetrators were agents, and/or employees of Defendant and operated under Defendant's instruction and control.  Defendant knowingly and intentionally aided and abetted or entered into a conspiracy or joint criminal enterprise with SAVAK and its officers/members in the unlawful conduct that led to the torture Plaintiffs endured.  This conduct was committed as a result of the policies enacted by Defendant in furtherance of the Shah's regime.

157.    By reason of Defendant's violation of ATCA, Plaintiffs have the private right of action against Defendants pursuant to 28 U.S.C. § 1350.

158.    Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT III

### VIOLATION OF THE ALIEN TORT CLAIMS ACT – CRUEL, INHUMAN, OR DEGRADING TREATMENT
### 28 U.S.C. § 1350
### (*All Plaintiffs Against Defendant Sabeti*)

159.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

160. Plaintiffs suffered from cruel, inhuman or degrading treatment and severe pain and suffering inflicted knowingly, deliberately, and intentionally for purposes which included, among others, obtaining information, punishing Plaintiffs, and intimidating or coercing Plaintiffs.

161. This conduct was in violation of customary international law and the ATCA.

162. By reason of Defendant's violation of the ATCA, Plaintiffs have the private right of action against Defendants pursuant to 28 U.S.C. § 1350.

163. Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT IV

### VIOLATION OF THE ALIEN TORT CLAIMS ACT– PROLONGED AND ARBITRARY DETENTION
### 28 U.S.C. § 1350
### (*All Plaintiffs Against Defendant Sabeti*)

164. The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

165. Plaintiffs were detained without due process during the period prior to them being charged and tried for a crime.  This pre-trial detention lasted in each case for several weeks to months.

166. Plaintiffs were injured by their prolonged and arbitrary detention in violation of customary international law and the ATCA.

167.    Defendant is liable for the harm suffered by Plaintiffs in that Defendant directly or through his agents knowingly and purposefully aided and abetted or entered into a conspiracy or joint criminal enterprise with SAVAK and the Committee in the unlawful conduct that led to Plaintiffs prolonged and arbitrary detention.  This conduct was committed as a result of the policies enacted by Defendant in furtherance of the Shah's regime.

168.    By reason of Defendant's violation of the ATCA, Plaintiffs have the private right of action against Defendants pursuant to 28 U.S.C. § 1350.

169.    Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT V

## VIOLATION OF THE ALIEN TORT CLAIMS ACT – CRIMES AGAINST HUMANITY
## 28 U.S.C. § 1350
### (*All Plaintiffs Against Defendant Sabeti*)

170.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

171.    Plaintiffs suffered from cruel, inhuman or degrading treatment and severe pain and suffering inflicted knowingly, deliberately, and intentionally for purposes which included, among others, obtaining information, punishing Plaintiffs, and intimidating or coercing Plaintiffs.  Such conduct constitutes crimes against humanity.

172.    Plaintiffs' torture was part of a widespread and systemic pattern of abuse against the civilian population of Iran, which included torture, prolonged and arbitrary detainment, and summary execution.

173.    As part of that pattern, each of the Plaintiffs was deliberately tortured by members of the Shah's security apparatus acting under color of law and acting under the command of, in conspiracy with, and/or as the agent of Defendant.

174.    The physical abuse and torture of Plaintiffs' violated customary international law prohibiting crimes against humanity.  Accordingly, this conduct was in violation of the ATCA.

175.    By reason of Defendant's violation of the ATCA, Plaintiffs have the private right of action against Defendants pursuant to 28 U.S.C. § 1350.

176.    Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

### COUNT VI

### ASSAULT
#### (*All Plaintiffs Against Defendant Sabeti*)

177.    The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

178.    Each of the Plaintiffs was subject to assaults by persons acting at Defendant's direction.  Plaintiffs were subjected to unlawful threats by words and actions to do violence to Plaintiffs.

179.    Plaintiffs were subjected to extreme violence including beatings, whippings, stress positions, electrocution, hanging by the wrists, hanging of weights from genitals, and/or use of the "Apollo" device.  Plaintiffs knew that other detainees had been subjected to these and other harms.  Plaintiffs also knew that other detainees had been tortured to death and/or the subject of extrajudicial killings.

180.    Plaintiffs' torturers, acting under authority granted by Defendant and at the intentional and unlawful encouragement and instruction of Defendant, had the apparent and actual ability to subject Plaintiffs to these and other conditions thereby creating the well-founded fear that violence was imminent.  Plaintiffs did reasonably fear that violence and/or death was imminent.

181.    Each of the Plaintiffs suffered severe physical and mental pain and suffering.  As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

182.    Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

183.    Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT VII

## BATTERY
### (*All Plaintiffs Against Defendant Sabeti*)

184.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

185.   Each of the Plaintiffs was subjected to batteries described above by individuals acting at Defendant's direction.  These batteries were designed, ordered, and implemented by Defendant with the intention of causing Plaintiffs bodily harm.

186.   Each of the Plaintiffs suffered severe physical and mental pain and suffering. As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

187.   Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

188.   Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT VIII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (*All Plaintiffs Against Defendant Sabeti*)

189.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

190.   The torturous acts described herein, which were in violation of international law and the laws of Iran, constitute outrageous conduct against the Plaintiffs.

191.   Defendant planned and directed security forces of SAVAK and the Committee including Mohammad Ali Shabani (alias Hosseini), Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Armanm, and Deghan intending that they physically abuse and terrorize members of the civilian population perceived to be opponents of the Shah's regime, including Plaintiffs.

192.   Plaintiffs suffered severe mental and physical injuries as a result of the torture inflicted while in custody.  All Plaintiffs were beaten, whipped, and forced into stress positions.  Some Plaintiffs were electrocuted, hung by their wrists, forced to use the "Apollo" (an electric chair with a metal mask designed to amplify Plaintiff's screams in his own ears), and/or had weights hung from their genitals.

193.    Plaintiffs were put in great fear for their lives and their suffering continues to this day.  Plaintiffs were forced to listen to the screams of pain of other detainees and saw the results of the vicious beatings and abuse these other detainees received.

194.    To this date, Plaintiffs suffer from the heavy burden of their trauma. All Plaintiffs suffer emotional distress when they think about their experiences. For example, at times, John Doe II has post-traumatic stress reactions when he tries to talk about his torture, including full-body shakes and feelings of dizziness. Plaintiffs also carry lasting scars and medical issues.  For example, Plaintiff John Doe I has suffered from kidney issues throughout his life as a result of the wounds and infections that he suffered while in prison.

195.    Plaintiffs repeatedly suffered threats of further violence against them and their families, threats which continue to this day by various Monarchists in the public sphere.

196.    The acts directed against Plaintiffs and other detainees so outraged the international community that United States pressured the Shah to ease the repressive measures against citizens. Defendant opposed any easing in the repression and torture of Iranian citizens.

197.    Defendant acted intentionally to cause Plaintiffs to suffer emotional distress, or, in the alternative, Defendant and his agents engaged in the conduct

with reckless disregard of the high probability of causing Plaintiffs to suffer emotional distress.

198.   This conduct constitutes intentional infliction of emotional distress and is actionable under the laws of the State of Florida.

199.   Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT IX

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (*All Plaintiffs Against Defendant Sabeti*)

200.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

201.   At all relevant times, Defendant owed the Plaintiffs a duty to act with reasonable care, and/or avoid reasonably foreseeable injury to Plaintiffs.

202.   Plaintiffs suffered severe mental and physical injuries as a result of the torture inflicted while in custody. All Plaintiffs were beaten, whipped, and forced into stress positions. Some Plaintiffs were electrocuted, hung by their wrists, forced to use the "Apollo" (an electric chair with a metal mask designed to amplify Plaintiff's screams in his own ears), and/or had weights hung from their genitals.

203.    At all relevant times, Defendant had the power, ability, authority and duty to stop engaging in the torturous conduct described herein and to intervene to prevent or prohibit such conduct.

204.    At all relevant times, Defendant knew, or reasonably should have known, that the conduct described herein would and did proximately result in Plaintiffs' physical and emotional distress.

205.    Despite said knowledge, power, and duty, Defendant's conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the State of Florida.

206.    Defendant negligently failed to stop engaging in the conduct described herein or to prevent or to prohibit such conduct or otherwise to protect Plaintiffs, thereby breaching his duty to them.

207.    To the extent that said negligent conduct was perpetrated by certain agents of the government, the Defendant confirmed and ratified said conduct with the knowledge that Plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

208.    As a direct and legal result of Defendant's wrongful acts, Plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

209.   To this date, Plaintiffs suffer from the heavy burden of their trauma. All Plaintiffs suffer emotional distress when they think about their experiences. For example, at times, John Doe II has post-traumatic stress reactions when he tries to talk about his torture, including full-body shakes and feelings of dizziness. Plaintiffs also carry lasting scars and medical issues.  For example, Plaintiff John Doe I has suffered from kidney issues throughout his life as a result of the wounds and infections that he suffered while in prison.

210.   Defendant's conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the State of Florida.

211.   Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT X

### NEGLIGENCE
### (*All Plaintiffs Against Defendant Sabeti*)

212.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

213.   Defendant failed to use ordinary or reasonable care to avoid injury to Plaintiffs.  Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

214.   As a result of these acts, Plaintiffs suffered harm including, but not limited to, physical injury, pain and suffering, and severe emotional distress.

215.   Defendant's conduct constitutes negligence and is actionable under the laws of the State of Florida and Iran.

216.   Plaintiffs are entitled to compensatory and punitive damages in amounts to be proven at trial.

## COUNT XI

### CIVIL CONSPIRACY
### (*All Plaintiffs Against Defendant Sabeti*)

217.   The allegations set forth in the above paragraphs are re-alleged and reincorporated by reference as if fully set forth below.

218.   Defendant entered into an agreement with members and of SAVAK and the Committee including Mohammad Ali Shabani (alias Hosseini), Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Armanm, and Deghan to suppress opposition to the Shah by subjecting Plaintiffs and others to assaults and batteries and/or for the unlawful purpose of obtaining false confessions.

219.   Defendant and others including Mohammad Ali Shabani (alias Hosseini), Manouchehr Vazifekhah (alias Manouchehri), Mohammad Hassan Nasseri (alias Azodi), Armanm, and Deghan engaged in overt acts in furtherance of this conspiracy including the approval and active torture of Plaintiffs and others.

220.   Defendant's conduct is actionable under the laws of the State of Florida.

Dated: February 10, 2025             Respectfully submitted,


By: */s/ Michelle J. Correll* _____
Michelle J. Correll, Esq.
(Fla. Bar No. 1029106)
**CORRELL LAW P.A.**
150 E. Palmetto Park Road, Suite 800,
Boca Raton, FL 33432
Telephone: (310) 425-3866
michelle@correll-lawfirm.com

*Attorneys for Plaintiffs [Does I thru III]*

221. Each of the Plaintiffs suffered severe physical and mental pain and suffering and are entitled to compensatory damages in an amount to be determined at trial.

222. Defendant's acts and omissions in furtherance of the conspiracy were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right to seek statutory damages and other relief.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendant as follows:

    a.    Compensatory and punitive damages, in an amount no less than $75 million dollars for each Plaintiff;

    b.    Attorney's fees and costs;

    c.    Such other and further relief as the Court may deem just and proper.