**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JOHN DOE I, JOHN DOE II,   and
JOHN DOE III,

                  Plaintiffs,

      v.

PARVIZ SABETI,

                  Defendant.

CASE NO.: 6:25-cv-219-GAP-DCI

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION OF FEBRUARY 14, 2025 ORDER**

Plaintiffs John Doe I, John Doe II, and John Doe III hereby oppose Defendant Sabeti's Motion for Reconsideration of the Court's February 14, 2025, Order (the "Motion") (Doc. 55).

**MEMORANDUM OF LAW**

## I.   Introduction

Defendant argues that, under a *de novo* standard of review, Plaintiffs should not be granted pseudonymity in this action and summarily states in a single footnote that his arguments under the *de novo* standard are similarly persuasive under the relevant standard on a motion for reconsideration.  (*See* Doc. 55 at fn.3.)  Neither

-1-

argument is persuasive for the reasons explained herein.  Furthermore, it is even more apparent now—given the nature and number of threats they received after filing their lawsuit—that Plaintiffs need the protection of the Court's original order. Plaintiffs were properly granted pseudonymity in this action and Defendant's Motion should be denied, irrespective of which standard is applied.

## II.   Argument

### A. The Motion Fails Under a Motion for Reconsideration Standard

"[T]he decision to grant [or deny] a motion for reconsideration is committed to the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion." *Henns v. Mony Life Ins. Co. of Am.,* No. 5:11-CV-55-OC-37TBS, 2012 WL 13098756, at *1 (M.D. Fla. Mar. 12, 2012) (citation omitted). "Courts in this District recognize 'three grounds justifying reconsideration of an order: (1) an intervening change in controlling law;[1] (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.' " *Adams v. Boeneman*, 335 F.R.D. 452, 454 (M.D. Fla. 2020) (citation omitted).  Moreover, this District "recognizes that a reconsideration of a previous order is an extraordinary

---

[1] Defendant's motion does not purport to identify any intervening change in law in support of reconsideration of the Court's Order (*see, generally,* Doc. 55) and indeed there has been no change. Plaintiffs only note this factor for completeness.

remedy to be employed sparingly." *Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D. Fla. 1994) (citation omitted).  Defendant fails to establish any of these grounds.

### 1.  New Evidence Overwhelmingly *Supports* Pseudonymity

Before filing their lawsuit Plaintiffs could only presume that they would be in danger if their identities were revealed. They now *know* that they are in danger after having received threats of violence and death from multiple sources, many of which directly reference support for Defendant.  On the other hand, what little "new evidence" Defendant presents relating to Plaintiffs' safety are self-serving assertions that Defendant disclaims connections with both the Monarchists and the Islamic Republic. No new evidence presented supports reconsideration of the Court's Order.

As noted in Plaintiffs' previous filings (*see* Docs. 44, 45), Plaintiffs and their counsel have received direct threats and numerous calls to action have encouraged physical harm to Plaintiffs after filing this lawsuit.  A greater sampling of these threats has been professionally translated from Farsi and is attached to the Declaration of Michelle J. Correll ("Correll Decl.") filed concurrently herewith. (*See* Correll Decl. ¶¶3-4, 6, Exs. A-D.)  These threats include, among others:

- "We are writing down each of your names, and tomorrow's free and prosperous Iran, we will hang each one of you from a penis of mullah on a

lamppost." (*id*. ¶3, Ex. A at 3);

• "I wish the late Shah had listened to the great Mr. Sabeti and had torn every mullah, leftist, and Mujahideen to pieces. You're afraid of him, aren't you? You know well that if he gains power, he will rip you apart. Go ahead and howl, but no—we, the people of Iran, will finish you off. Long live Pahlavi and SAVAK!" (*id*. at 7);

• "Don't talk shit. If a single hair on his [Sabeti's] head is touched, we won't leave your parents alive, you scumbags." (*id*. at 16);

• "We demand the revelation of the names of these three vile traitors to the people and the country. I wish they had been sterilized or tossed into the Persian Gulf for sharks to devour and get diarrhea" (*id*. at 17);

• "We will deal with the sisters and mothers of these three commies" (*id*. at 20);

• "The first thing we will do in defense of His Excellency Mr. Parviz Khan Sabeti… is to find, through the court in Orlando (Florida), the name, office address, and office phone number of that filthy lawyer who filed this complaint for those three terrorist murderers from the Fedai-Mojahedin… and then, with thousands of fellow Iranians, we will launch a campaign against him so that his entire life and everything he owns is reduced to ashes… Then you'll see how that bastard, scammer, greedy lawyer tucks his tail between his legs and runs away! Then we'll go after those three terrorists… and we'll bring upon them the very punishment that SAVAK, due to mercy, honor, and patriotism, did not inflict. We will take revenge on those three criminals for all the victims of 1978. (*id*. at 27); and

• "These people won't stop harassing Iran and Iranians until they're dead. We will not hold back in supporting Mr. Sabeti." (*id*. at 29).[2]

---

[2] Defendant also appears to be in contact with this threat-maker, Shahin Nehjad. On February 14, 2023, this individual tweeted a photo of himself standing alongside Defendant, noting that "From time to time, I have conversations with him." (Correll Decl. ¶3, Ex. A at 30.)

Again, this is a small sampling of the threats that have been made.

In fact, Plaintiffs' counsel, who did not have the privilege of the Court's order on pseudonymity was directly threatened with death by someone who the FBI determined was located *in Iran*. (Correll Decl. ¶9.) The sender of that email wrote:

> "Do you now the Great Mr.Parviz Sabeti ?
> You bitch
> I'll shot in your mouth mother fucker bitch !"

(*Id*.) Other individuals "doxed" Plaintiffs' counsel, publishing her information in response to Makoui's call to identify Plaintiffs' counsel and turn everything they had "to ashes." (*See* Correll Decl. ¶¶6-8, Exs. D-G.)

At best, Defendant is connected to the Monarchist movement through its clear and active support of him. (*See, generally,* Correll Decl. ¶¶3-8, Exs. A-G.) At worst, Defendant has direct contact with and influence over members of the Monarchist movement who have threatened Plaintiffs and their counsel. Also of concern to Plaintiffs are statements made by supporters of Defendant referring to a "new and popular SAVAK" as having been established and "actively operating." (Correll Decl. ¶3, Ex. A at 33; *see also id*. at 32 ("Who sues His Excellency #Parviz_Sabeti? […] #I_am_SAVAK_too").)

One individual who threatened Plaintiffs and their counsel, Dr. Makoui, (*id*. at 27) spoke to Sabeti about this case *prior to* the filing of Defendant's initial

-5-

"Response" in which Defendant disclaims any ties to or involvement with Monarchists. (*See* Doc. 41 at 10; *compare* Doc. 55 at 18; Doc. 47 FAC at ¶149; Correll Decl. ¶3, Ex. A at 28.) Although Sabeti continues to disclaim any connection to Dr. Makoui (while admitting to speaking with him), he also fails to identify the "intermediary" who connected the two. (*See* Doc. 55-1 at ¶33.) Following his public threats, Makoui participated in multiple interviews with Morteza Esmailpour.[3] On February 25, 2025, Esmailpour hosted a program regarding this lawsuit with Iraj Mesdaghi. During the interview, Mesdaghi remarked that once Defendant obtained the names of Plaintiffs they could be leaked publicly by Mesdaghi and then "[i]t's over." (Correll Decl. ¶10, Ex. I at 2.) Sabeti's biographer, Erfan Ghanei Fard,[4] has also appeared on Iranian media as a de facto spokesperson for Sabeti, making disparaging remarks about both the Plaintiffs and counsel for this case,[5] and has

---

[3] *See, e.g.,* Morteza Esmailpour, *goftego ba dokter sheharam makoyi: bozorgtarin tajma hamayati az shazadeh reza ppeloye dar vashangtan [Interview with Dr. Shahram Makoui: The largest rally in support of Prince Reza Pahlavi in Washington]*, YOUTUBE (Mar. 1. 2025), https://www.youtube.com/watch?v=t4S9AyaeL5s.

[4] *See* Doc. 47 FAC at ¶153; Erfan Ghanei Fard, Dar Damgahe Hadese: goftogooi Ba Parviz Sabeti, Modire Amniate Dakhelie Savak (2012); Correll Decl. ¶11, Ex. K.

[5] *See* Doc. 47 FAC at ¶148; *see also* Iran International, *cheshmandaz: qaemmagham savak proyz sabati mohakameh mishod? menazereh arafan ghaneifard ve farj sarkoveyi [Outlook: Will SAVAK Deputy Chief Parviz Sabeti be tried? Debate between Erfan Qaneifard and Faraj Sarkouhi]*, YOUTUBE (Feb. 26, 2025), https://www.youtube.com/watch?v=7B1ZiLwmDEc.

jointly appeared on other Iranian talk shows with Mesdaghi.[6] These statements indicate a plan by individuals in Defendant's orbit and/or in direct contact with Defendant to leak Plaintiffs' names.

Plaintiffs do not find Defendant's disavowal of any ties to the Monarchist movement or disapproval of threats made by Makoui to be credible. Defendant misled the Court by failing to disclose his knowledge of threats against Plaintiffs in his initial filings. Only when confronted with evidence of these omissions did Defendant claim he contacted Makoui to urge restraint, a claim undermined by Makoui's subsequent social media posts which continue to praise Defendant and disparage Plaintiffs without retracting any prior threats. (*See, e.g.,* Correll Decl. ¶4, Ex. C at 6.)  Defendant continues to present himself as a disengaged elderly man, concealing the influence he retains within Monarchist circles. On February 26, 2025, ManotoTV—a Monarchist-aligned news outlet[7]—posted a video calling for

---

[6] *See, e.g.,* Persian Clubhouse 1, *goftegoye akhtesasi ba arafan ghanei fard,bah cpehmarah tahlili az irj masdaghi;az kampin s.le.ye.t.yeh ta told rezashah [Exclusive interview with Erfan Ghaneifard, along with analysis by Iraj Mosadaghi; from the S.L.I.T.A. campaign to the birth of Reza Shah]* YOUTUBE (Mar. 20, 2024), https://www.youtube.com/watch?v=tJfISGk0Ftw.

[7] While Plaintiffs contend that ManotoTV's Monarchist alignment is facially evident (*see* ManotoTV, YOUTUBE, https://www.youtube.com/manototv), other news sites have recognized ManotoTV's Monarchist alignment (*see, e.g., Iran Executes Nuclear Scientist In U.S. Spy Mystery,* CBS (Aug. 7, 2016, 12:07 PM), https://www.cbsnews.com/newyork/news/iran-executes-nuclear-scientist/ ("Manoto, a private satellite television channel based in London believed to be run by those who back Iran's ousted shah … ")).

Defendant to lead a reconstituted SAVAK: "We demand the return of SAVAK…

under the leadership of Mr. Parviz Sabeti. … Long live the Shah. For Manoto (TV)."

(Correll Decl. ¶4, Ex. C at 4.) Defendant also previously produced a documentary

glorifying his SAVAK tenure with ManotoTV's parent company, Marjan Television

Network, which can be viewed on ManotoTV's YouTube channel.[8]

Finally, Plaintiffs' fear of attack from the Islamic Republic is based on the

notion that the Islamic Republic has a history of violently suppressing any efforts to

shine light a on its human rights violations, which Plaintiffs' lawsuit does. (*See, e.g.,*

Doc. 47 FAC at ¶¶123-137, 160-167.)[9] Defendant is wholly silent as to his

relationship with individuals affiliated with the IRGC, including Erfan Ghanei Fard

and the producer of his documentary. (*See* Doc. 47 FAC at ¶¶153-156; *compare,*

*generally* Doc. 55-1.)[10] These connections undermine Defendant's credibility and

alleged fear of the Iranian regime and instead underscore the basis for fear by

---

[8] *See* PARVIZ SABETI (Marjan Television Network released Nov. 4, 2023); ManotoTV, *Parviz Sabeti*, https://www.youtube.com/playlist?list=PLXiFD28PjqaI28JIRkyxuYcUnSfJy2RqF.

[9] *See also U.S. v. Amirov*, No. S8 22 CR. 438 (CM) (S.D.N.Y); *Two Eastern European Organized Crime Leaders Convicted of Murder for Hire Targeting U.S.-Based Journalist on Behalf of Iranian Government*, OFFICE OF PUBLIC AFFAIRS, U.S. DEPARTMENT OF JUSTICE (Mar. 21, 2025), https://www.justice.gov/opa/pr/two-eastern-european-organized-crime-leaders-convicted-murder-hire-targeting-us-based.

[10] Plaintiffs are willing to have an evidentiary hearing after discovery on the issue of Defendant's connections to IRGC-affiliated individuals if the Court deems it necessary to the issue of Plaintiffs' pseudonymity.

Plaintiffs. Notwithstanding this information, the threat to Plaintiffs is independent from how the Islamic Republic views Defendant.

None of the evidence presented by Defendant warrants reversal of the Court's Order granting pseudonymity, and the threats made against Plaintiffs and their counsel since the Court's Order only confirms that Plaintiffs need the protection of the Court's original order.

### 2. Defendant Fails to Identify Clear Error or Manifest Unjustness in the Court's Pseudonym Order

Throughout the Motion, Defendant claims without elaboration that the Court's Order violates his due process rights.  However, Defendant has continually failed to articulate why knowledge of Plaintiffs' identities is crucial to his defense. The First Amended Complaint does not allege that Defendant directly tortured Plaintiffs. Rather, Plaintiffs allege that Defendant "possessed and exercised effective command and control over the security apparatus of Iran, including the Third Division of SAVAK and the Committee, and approved the torture of thousands of Iranian citizens including Plaintiffs."  (*See* Doc. 47 FAC at ¶47.)  Defendant can adequately defend himself by presenting evidence that he was not involved in approving torture *at all*. Notably, Defendant has thus far failed to disclaim any involvement in ordering torture.

It is not unheard of for a plaintiff's identity to be kept anonymous from a defendant.  (*See, e.g.,* Confidentiality Order, *Doe I v. Islamic Salvation Front,* 993 F.Supp.3 (D.D.C. 1998) (No. 96-02792) (filed Aug. 25, 1998).) And granting pseudonymity to Plaintiffs does not constitute clear error given the weight of the evidence supporting pseudonymity as established in Plaintiffs' initial motion and addressed in further detail below.  Nor does granting pseudonymity constitute manifest unjustness as there is nothing preventing the Court from ordering Plaintiffs' identities confidentially disclosed only to opposing counsel and only pursuant to a protective order if Defendant makes a showing (which he has thus far failed to) that their identities are required for discovery purposes. *See Plaintiff B v. Francis*, 631 F.3d 1310, 1318–19 (11th Cir. 2011) (noting lack of prejudice to defendant); *see also Florida Abolitionist, Inc. v. Backpage.com LLC*, No. 617CV218ORL28TBS, 2018 WL 2017535 (M.D. Fla. May 1, 2018); *C. S. v. Choice Hotels Int'l, Inc.*, No. 2:20-CV-635-JES-MRM, 2021 WL 2792166 at *6 (M.D. Fla. June 11, 2021).

In fact, here, it would be an abuse of discretion for the Court to issue a blanket order forcing Plaintiffs to unconditionally reveal their identities to Defendant at this time as Defendant demands. Defendant has not articulated any specific reason Plaintiffs' identity is necessary to his defense. The Eleventh Circuit expressly recognizes that "[a] district court abuses its discretion in denying a motion to remain

-10-

anonymous if it fails to actually consider the circumstances of the case and to weigh the relevant factors and instead follows a blanket rule in making its final decision." *Plaintiff B,* 631 F.3d at 1315 (citing *James v. Jacobson,* 6 F.3d 233, 239–43 (4th Cir. 1993), which held that the district court abused its discretion in denying motion to remain anonymous during trial when it ruled based "on the basis of general disapproval of party anonymity at trial").  Under the circumstances present here, a protective order is warranted if the Court is inclined to order disclosure of Plaintiffs' identities after a specific showing of relevancy by Defendant for discovery purposes.

The Court's original order properly granted Plaintiffs pseudonymity in this action, and Defendant has failed to establish any basis supporting its reconsideration.

### B. Defendant's Motion Fails Under a *De Novo* Standard of Review

Even under a *de novo* standard, Plaintiffs should still be granted the pseudonymity provided in the Court's Order. "Courts have traditionally defined 'de novo review' to mean 'that the whole process before the district court would start from scratch, as if the proceedings [below] had never occurred.' " *Hanna v. WCI Communities, Inc.,* 348 F.Supp.2d 1322, 1329 (S.D. Fla. 2004) (citations omitted).[11]

---

[11] Accordingly, the standards initially outlined in Plaintiffs' Motion for Leave to Proceed by Pseudonym would apply and this Court is entitled to consider the new evidence submitted in Exhibit A to the Declaration of Michelle J. Correll.

"A party may proceed anonymously in a civil suit in federal court by showing that he has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Plaintiff B,* 631 F.3d at 1315-16 (internal quotations and citations omitted). District courts must "consider the circumstances of the case and…weigh the relevant factors." *Id.* at 1315. In doing so, district courts generally consider three principal factors: (1) "are the plaintiffs seeking anonymity challenging government activity?"; (2) "will they be required to disclose information of the utmost intimacy?"; and (3) "will they be compelled to admit their intention to engage in illegal conduct and thus risk criminal prosecution?" *Id*. at 1316 (citing *Doe v. Stegall,* 653 F.2d 180, 185 (5th Cir. 1981)). Courts have also considered factors "such as whether the plaintiffs were minors…[and] whether they were threatened with violence or physical harm by proceeding in their own names." *Id*. (citing *Stegall,* 653 F.2d at 186). While Courts should also analyze whether the requested anonymity "poses a unique threat of fundamental unfairness to the defendant," as is the case here, a "general plea for openness is not convincing when stacked against strong evidence supporting a need for anonymity." *In re Chiquita Brands Int'l Inc.,* 965 F.3d 1238, 1247 (11th Cir. 2020) (internal quotations and citations omitted). The circumstances and factors at play here overwhelmingly favor allowing Plaintiffs to proceed via pseudonym.

### 1.  Plaintiffs Face Real Threat of Harm from Multiple Sources

Plaintiffs face legitimate threat of harm from multiple sources if they are forced to reveal their identities.  Plaintiffs' allegations of the threats and violence they face are not overly generalized, are connected to Defendant, and are connected to the subject matter of the case, weighing decisively in favor of anonymity.

The threat faced by Plaintiffs from Monarchists in the United States is specific and connected to this lawsuit. As noted in Plaintiffs' previous filings (Docs. 44, 45), subsequent to the filing of the initial complaint in this matter (and subsequent to Plaintiffs' Motion for Leave to Proceed By Pseudonym), Plaintiffs and their counsel received death threats specifically related to their bringing this case.  (*See, supra,* section II.A.1; *see also, generally,* Correll Decl. ¶¶3-9, Exs. A-H.)  Defendant has admitted to having personal contact with at least one such threat-maker, Dr. Makoui, who also had contact with a talk show host who discussed leaking Plaintiffs' identities.  (*See supra* section II.A.1.)  Plaintiffs have established Defendant's direct connections with multiple individuals involved in issuing public threats to Plaintiffs. (*See id.*)  The connections between Defendant and these individuals are real, directly connected to this lawsuit, and present an active concern for Plaintiffs' safety.

There also exist numerous public calls amongst the Monarchist faction for Defendant to return to government engagement. (*See, e.g.,* Correll Decl. ¶4, Ex. C

-13-

at 4.) Regardless of whether Defendant currently wishes to do so, violent individuals within the United States support Defendant stepping up as a leader and have proclaimed an interest in advancing what they perceive to be his interests. (*See, generally,* Correll Decl. ¶3-4, Exs. A-C.) To disclaim any connection with such individuals when their public support is so pervasive is simply unbelievable.

Furthermore, as stated in Plaintiffs' initial Motion for Leave to Proceed by Pseudonym, Plaintiff Doe I has had repeat, threatening contact with elements of the Iranian government throughout his time in the United States and Plaintiff John Doe III was previously violently attacked by supporters of the Islamic Republic in the United States. (Doc. 4 at 15-16.) As Defendant points to in his own Motion, the Islamic Republic has no issue targeting individuals abroad. (*See* Doc. 55 at 4-5, fn.1.) Regardless of whether the Islamic Republic supports Defendant,[12] Plaintiffs have an independent basis upon which to fear being targeted by the Islamic Republic for their participation in this lawsuit. After all, Plaintiffs have alleged that the

---

[12] Defendant's contention that he "ha[s] no ties with government officials of the Islamic Republic of Iran" (Doc. 55-1 at ¶11) is overly narrow. Plaintiffs have alleged other ties between Defendant and the Islamic Republic (*see* Doc. 47 at ¶¶ 153-158) which Defendant has not denied. In fact, Defendant's personal biographer and seeming friend, Erfan Ghanei Fard, has regularly traveled to Iran for state-sponsored events, including after the release of Defendant's biography. (*See, e.g.,* Correll Decl. ¶11, Ex. K.) Certainly, if Defendant were an enemy of Iran, as he purports to be, his biographer would not be allowed, let alone welcomed, back into the country.

Islamic Republic has continued SAVAK's policies of repression, censorship, torture and executions (some of which were pioneered by and advocated for by Defendant) against the same elements in Iranian society: ethnic and religious minorities fighting for their rights, intellectuals, artists, and dissidents with liberal viewpoints. (Doc. 47 FAC at ¶¶127-130.) Plaintiffs reasonably believe that they will face persecution from the Iranian government for their participation in this lawsuit, similar to the persecution various journalists in the United States face from the Islamic Republic.[13]

The threats faced by Plaintiffs are clear, real, directly connected to this lawsuit, and weigh heavily in favor of granting pseudonymity.

### 2. Defendant's Reputation is Not Damaged by This Action

The Court should consider the full circumstances of Defendant's preexisting reputation when considering this factor. The significance of the principle behind this factor is premised on reasoning that suits against individuals "may cause damage to their good names and reputation and may also result in economic harm." *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir. 1992). It is undeniable that Defendant has been publicly accused of torture before. (*See, e.g.,* Doc. 47 FAC at ¶¶69-71.)

---

[13] *See, e.g.,* Doc. 47 FAC at ¶134; *U.S. v. Amirov*, No. S8 22 CR. 438 (CM) (S.D.N.Y.). Plaintiffs have not returned to Iran since they left and are willing to provide declarations stating such.

Defendant's historical profiles have centered on his involvement in torture; Iranian scholars have noted that Sabeti was one of the "most despised figures of the Pahlavi regime."[14]   Defendant's reputation is inseparable from his tenure with SAVAK and association with interrogation and torture.   Therefore, Defendant's reputation has already been tarnished.   Defendant himself recently publicly raised the issue of such allegations in his 2023 documentary.[15]   While Defendant argues that he has a good reputation, notably absent from any of Defendant's filings thus far in this matter, is a denial that he condoned or directed torture during his time in SAVAK.   His reputation is not further damaged by this case.   Regardless, this issue is not determinative of whether Plaintiffs should be allowed to proceed via pseudonym.

### 3.   Plaintiffs' Allegations are of the Utmost Intimacy

The undeniably intimate nature of Plaintiffs' allegations has been well established and provided in unredacted form to Defendant.   "Plaintiffs in this case

---

[14] MASOUD KAZEMZADEH, MASS PROTESTS IN IRAN: FROM RESISTANCE TO OVERTHROW 183 (De Gruyter Contemporary Social Sciences Vol. 38, 2023); *see also, e.g.,* ABBAS MILANI, EMINENT PERSIANS: THE MEN AND WOMEN WHO MADE MODERN IRAN, 1941-1979, 290 (2008) ("The "Committee" developed a notorious reputation as a den of torture and brutality, and in the public imagination it was Sabeti's name that was identified with the committee and its notoriety.").

[15] Even Defendant's daughter Parviz Sabeti has publicly recounted at least one incident in which an individual sent a mass email about her father's background to a large group of Harvard faculty members. *See* NUFDI, *Dr. Pardis Sabeti | Iran Uncovered #12*, YOUTUBE (Nov. 2, 2024), https://www.youtube.com/watch?v=RVZFi_0g_j8.

will describe the traumatizing and intimate details of their torture allegations, 'which include[] psychological torment, beatings, whippings…and torture…directed at their genitals.' Doc. 4 at 12; Doc. 1, ¶¶ 3, 76, 88, 92, 93, 97. […][16] All three Plaintiffs here consider the details of their alleged torture, which they do not openly share even among their own families, to be 'deeply personal, humiliating, and difficult to talk about' Doc. 4 at 12-13. For John Doe II, despite years of therapy, talking about his torture experiences can cause post-traumatic stress reactions, 'including full body shakes and feelings of dizziness.' Doc. 1, ¶¶ 92-93." (Doc. 16 at 7.) This information—provided *unredacted* to Defendant in Plaintiffs' Motion, their supporting declarations, and recounted by this Court in its Order—serves "to corroborate their allegations concerning the fear or embarrassment of proceeding under their own names," (Doc. 55 at 22) as this Court initially found (Doc. 16 at 7).[17] Furthermore, this information heavily supports allowing Plaintiffs to proceed by pseudonym. *See Choice Hotels Int'l, Inc.*, 2021 WL 2792166, at *4.

---

[16] Plaintiff John Doe II does not allege that he was a minor when he was arrested and detained. Although he was still a high school student, he was 18-years-old.

[17] Plaintiffs emphasize what information was provided to Defendant unredacted in response to Defendant's exaggerated claim that the redactions have "made it impossible for Mr. Sabeti to evaluate the Plaintiffs' grounds for seeking pseudonymous treatment." (Doc. 55 at 5.) The Court is, of course, entitled to consider the information provided under seal without Defendant needing to review it.

Contrary to Defendant's assertion, without reference to any supporting law, the passage of time does not make the subject matter of this case any less sensitive. This is readily apparent from Plaintiffs' declarations which state, unredacted, that this case concerns information they do not disclose to their own family, due to its distressing and stigmatizing nature and that talking about their experiences being tortured can, even now, cause extreme physical reactions.  (Doc. 4 at 12-13.)

Finally, any motives Plaintiffs may have in bringing this action are irrelevant to the issue of whether their allegations are of the utmost intimacy.[18]  Plaintiffs are not to be accorded less protection than the law allows simply because they wish to pursue, through valid channels, legal claims against the man who authorized their torture.[19]  Plaintiffs' torture is a stigmatizing matter of the utmost intimacy which weighs in favor of pseudonymity.

Considering the totality of the circumstances, including the threats of violence from various sources, the previously well-known allegations of torture against

---

[18] Plaintiffs' pseudonymity is not without cost to Plaintiffs. Pseudonymity has prevented them from addressing disparaging news and public allegations made as to their identity and motivations. But this pseudonymity is essential for their protection.

[19] Defendants cite to *Doe v. Shakur,* 164 F.R.D. 359, 361 (S.D.N.Y. 1996), in support of their contention that it would be unfair for Plaintiffs to proceed anonymously. (Doc. 55 at 22-23.) However, this case is noncontrolling and readily distinguishable as the Court in *Shakur* noted that the individuals who posed a threat to the plaintiff already knew her identity, unlike Plaintiffs here.

Defendant, and the intimate details of Plaintiffs' allegations, the Court's Order properly granted Plaintiffs pseudonymity in this action.

### C. If the Court Requires Disclosure[20] of Plaintiffs' Identities, It Should be Subject to a Protective Order

To the extent that the Court is inclined to require any disclosure of Plaintiffs' identities, Plaintiffs request such disclosure be only to Defendant's attorneys[21] and only *after* the Court has ruled on Defendant's Motion to Dismiss (Doc. 59), which will be fully briefed in July. To the extent Defendant is able to articulate discovery for which Plaintiffs' identity is necessary—which he has yet to do—Plaintiffs would propose (and request that the Court use its discretion over the timing and sequence of discovery to order) a consecutively bifurcated discovery schedule which would first address Defendant's role in ordering torture before addressing the specific abuses suffered by Plaintiffs' and Defendant's involvement therein. Plaintiffs'

---

[20] The Court's only comment as to disclosure of Plaintiffs' identities to Defendant in its Order was that "Moreover, Plaintiffs' willingness to confidentially permit their identification for limited discovery purposes underlines that their anonymity poses no unique threat of fundamental unfairness to Defendant in his ability to defend himself." (Doc. 16 at 9.) Defendant's characterization of this statement as requiring Plaintiffs to provide their identities now is misleading. (See Doc. 55 at 9-10.) There is currently no protective order governing this action and discovery has not yet begun. (Correll Decl., ¶12.)

[21] This Court has considerable powers to specify the parameters of protective orders. Fed. R. Civ. P. 26(c) permits a court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

specific individual identities are undeniably irrelevant to the first proposed phase. Despite the early stage of this proceeding, there have already been circumstances which raise reasonable concerns over Defendant sharing and spreading Plaintiffs' identities to the public, including to individuals who clearly wish to harm and silence Plaintiffs.  In light of these circumstances, Plaintiffs further request discovery on issues relating to Defendant's communications with anyone other than his counsel regarding this case.

## III.  Conclusion

For all the foregoing reasons, the Court should deny Defendant's Motion for Reconsideration.  However, if the Court is inclined to order Plaintiffs to disclose their identities, this disclosure should be to Defendant's attorneys only subject to a protective order.

DATED:  June 4, 2025

*/s/ Michelle J. Correll*_____
Michelle J. Correll (Fla. Bar No. 1029106)
Correll Law P.A.
150 East Palmetto Park Road, Suite 800
Boca Raton, FL 33432
(310) 425-3866
Michelle@Correll-LawFirm.com

Attorneys for Plaintiffs

-20-