# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JOHN DOE I, JOHN DOE II, and
JOHN DOE III,

v.                                          Case No: 6:25-cv-219-GAP-DCI

PARVIZ SABETI,

                Defendants.

## ORDER

This cause comes before the Court on Defendant's Motion for Reconsideration of this Court's Order granting Plaintiffs' request to proceed pseudonymously. Doc. 55; *see* Doc. 16. The Court has also considered Plaintiffs' Response in Opposition and Defendant's Reply.[1] Doc. 60; Doc. 67.

## I.   Background

On February 10, 2025, Plaintiffs John Doe I, John Doe II, and John Doe III ("Plaintiffs") filed suit against Defendant Parviz Sabeti ("Defendant") under the Torture Victim Protection Act ("TVPA") alleging that he led and oversaw secret policing, abuse, and torture during the government of Mohammad Reza Pahlavi,

---

[1] In addition, the Court has considered Plaintiffs' First and Second Requests for Judicial Notice and Defendant's corresponding Responses and Motion to Strike. *See* Doc. 62; Doc. 68; Doc. 71; Doc. 72; Doc. 73; Doc. 74; Doc. 79.

the former Shah of Iran. Doc. 1, ¶ 1. Plaintiffs simultaneously filed an *Ex Parte* Motion for Leave to Proceed by Pseudonym with their Complaint. Doc. 4. Plaintiffs argued that if their identities were not protected, they would suffer "real threats to [their] safety posed by potential retaliation from the Iranian government and from violent supporters of the former monarchy." *Id.* at 2.

Though Defendant had yet to appear, the Court issued an Order (the "Pseudonym Order") provisionally granting Plaintiffs' motion subject to reconsideration upon appearance by Defendant. *See Plaintiff B v. Francis*, 631 F.3d 1310, 1314, 1315-19 (11th Cir. 2011) (reversing and remanding a district court's denial of a motion to proceed anonymously but finding no error in court's procedure of preliminarily granting the motion before revisiting the issue prior to trial). Put briefly, the Pseudonym Order acknowledged the legitimate concerns Plaintiffs raised regarding threats to their lives and the embarrassment, mental suffering, and social stigma associated with publicly sharing the experiences which underlie their TVPA claims. *See generally* Doc. 16. The Court concluded that those concerns outweighed Defendant's interest in disclosure, however recognized that "Plaintiffs' willingness to confidentially permit their identification for limited discovery purposes" allayed that prejudice. *Id.* at 9.

On March 10, 2025, Defendant first appeared in the case and, after some confusion over procedural matters, filed a Motion for Reconsideration of the

Pseudonym Order on May 21, 2025. Doc. 55.

In the interim, Plaintiffs filed a First Amended Complaint ("FAC"), which Defendant moved to dismiss for failure to state a claim. *See* Doc. 47; Doc. 59. After granting Defendant's motion to dismiss Plaintiffs' state claims, the Court upheld Plaintiffs' TVPA claim and ordered that these proceedings be bifurcated to first determine whether their claim is barred by the statute of limitations. *See* Doc. 81 at 15-16. If the Court determines that Plaintiffs' equitable tolling defense is successful, then this litigation will proceed to a second phase for resolution of their TVPA claim on the merits. *See id.*

## II.    Legal Standard[2]

Federal Rule of Civil Procedure ("FRCP") 10(a) requires that any pleadings filed in federal court "must name all the parties." "This rule serves more than administrative convenience. It protects the public's legitimate interest in knowing

---

[2] Defendant reasonably argues that because he was never afforded the opportunity to respond to Plaintiffs' initial *ex parte* motion, the Court should review his Motion under the *de novo* standard, not the more restrictive reconsideration standard. Doc. 55 at 8; *see, e.g., Molex v. Wyler*, 334 F.Supp.2d 1083, 1085 (N.D. Ill. Sept. 2, 2004) ("However, because we granted Wyler's motion to dismiss without allowing Molex the opportunity to brief the issues, we will not apply these standards strictly here."). The Court agrees. In any event, there is new evidence to consider on this issue and Defendant is entitled to respond to Plaintiffs' request to proceed anonymously; both sufficient bases for reconsideration of the Pseudonym Order. *See Adams v. Boeneman*, 335 F.R.D. 452, 454 (M.D. Fla. May 4, 2020) ("Courts in this District recognize three grounds justifying reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.") (internal quotation and citations omitted).

all of the facts involved, including the identities of the parties." *Plaintiff B*, 631 F.3d at 1315 (quoting *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir.1992)). While this rule creates a strong presumption against anonymity, "the rule is not absolute." *Id.* FRCP 26(c)(1) vests in the trial court discretion over litigants' requests for protection from "annoyance, embarrassment, oppression, or undue burden or expense" in the discovery process.

"A party may proceed anonymously in a civil suit in federal court by showing that he has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Plaintiff B*, 631 F.3d at 1315-16 (internal quotations and citations omitted). However, there is "no hard and fast formula for ascertaining whether a party may sue anonymously." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981).[3] In ruling on a motion to remain anonymous, district courts must "consider the circumstances of the case and…weigh the relevant factors." *Plaintiff B*, 631 F.3d at 1315.

District courts consider three principal factors when weighing whether to allow party anonymity: (1) "are the plaintiffs seeking anonymity challenging government activity?"; (2) "will they be required to disclose information of the

---

[3] The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

utmost intimacy?"; and (3) "will they be compelled to admit their intention to engage in illegal conduct and thus risk criminal prosecution?" *Id.* at 1316 (citing *Stegall*, 653 F.2d at 185). Courts have also considered factors "such as whether the plaintiffs were minors…[and] whether they were threatened with violence or physical harm by proceeding in their own names." *Id.* (citing *Stegall*, 653 F.2d at 186).

While Courts should also analyze whether the requested anonymity "poses a unique threat of fundamental unfairness to the defendant," his "general plea for openness is not convincing when stacked against strong evidence supporting a need for anonymity." *In re Chiquita Brands Int'l Inc.*, 965 F.3d 1238, 1247 (11th Cir. 2020) (internal quotations and citations omitted).

## III.    Analysis

### A. Judicial Notice

As a threshold matter, Plaintiffs request that the Court take judicial notice of a slew of exhibits consisting of web and news articles, blog posts, book excerpts, and YouTube videos.[4] Doc. 62; Doc. 72. Defendant argues that judicial notice of

---

[4] The exhibits attached to Plaintiffs' First Request for Judicial Notice are as follows: (1) a March 21, 2025 press release from the U.S. Department of Justice website regarding an Iranian murder-for-hire plot targeting a U.S.-based journalist; (2) an August 7, 2016, CBS News article about Iran's execution of a nuclear scientist with U.S. ties; (3a) & (3b) a blog post in Farsi (3a) and English (3b) discussing the release of Defendant's memoir; (4)-(5) published book excerpts; (6) screenshots and links to a 2023 YouTube documentary series about Defendant; (7)-(10)

these exhibits is improper under Federal Rule of Evidence ("Rule") 201 because Plaintiffs seek to rely on them for the truth of their contents or that they are "not capable of accurate and ready determination." *See* Doc. 79 at 3; Doc. 68.

However, upon consideration, these exhibits all derive from publicly available sources and, because neither Plaintiffs nor the Court have any interest in these exhibits for the truth of their contents, Defendant's quibbles with the accuracy of translations or the accounts given are misplaced.[5] *See Trump v. Clinton*, 626 F. Supp. 3d 1264, 1296-97 (S.D. Fla. 2022) (taking judicial notice of tweets and collecting cases); *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration and Elections*, 36 F.4th 1100, 1123 (11th Cir. 2022) (taking judicial notice of information on a website*); Mirlis v. Greer*, 952 F.3d 51, 63, n.11 (2d Cir. 2020) (taking judicial notice of blog posts); *Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir. 2017) (taking judicial notice of Plaintiff's tweets) (reversed on mootness grounds in *Trump v. Hawaii*, 583 U.S. 941 (2017)).

---

screenshots and links to contemporary YouTube videos of Iranians discussing the instant case; (11) a November 2, 2024, YouTube interview of Defendant's daughter, Pardis Sabeti. *See* Doc. 62-1—62-12. Plaintiffs' Second Request for Judicial Notice includes the following exhibits: (A) a book cover with certified translation; (B) a certified translation of the YouTube documentary screenshot [corresponds to ex. 6]; (C)-(F) a certified translation of YouTube video descriptions [correspond to Exs. 7-10]. *See* Doc. 72-1—72-6; *see also* Doc. 62-6—62-10.

[5] Moreover, in their Second Request Plaintiffs provided certified translations for all of the webpage descriptions that were without translation in the First Request. *Compare* Docs. 72-2—72-6 *to* Docs. 62-6—62-10.

The Court therefore grants Plaintiffs' request and takes judicial notice of the exhibits listed *supra* at note 4; not for the truth of the matters asserted therein, but for their existence. Defendant's Motion to Strike (Doc. 73) is **DENIED**.

## B. Propriety of Pseudonymity

Having already substantially weighed the *Stegall* factors in the Pseudonym Order, the Court now addresses each of Defendant's arguments for reconsideration in turn. 653 F.2d at 185.

### 1. *Defendant's Risk of Violence*

Defendant devotes substantial discussion to the fact that he "is an octogenarian immigrant from Iran who, for more than four decades, has lived a productive, peaceful life in the United States." Doc. 55 at 2, 12-18. He suggests that the idea of his "preparing to run a security agency…in his late 80s or early 90s is…patently absurd." *Id.* at 4. Instead, Defendant "seeks only to live out his remaining years in peace with his family." *Id.*

However, this Court must weigh the severity of threatened harm to Plaintiffs if they proceed under their actual names—whether it comes from Defendant or third parties. *See Plaintiff B*, 631 F.3d at 1315. Since the filing of this lawsuit, Plaintiffs have produced significant evidence of serious threats to their safety and well-being, in addition to similar threats directed to their legal counsel, which include:

- "I wish the late Shah had listened to the great Mr. Sabeti and had torn every mullah, leftist, and Mujahideen to pieces. You're afraid of him, aren't you? You know well that if he gains power, he will rip you apart. Go ahead and howl, but no—**we, the people of Iran, will finish you off**. Long live Pahlavi and SAVAK!" (Doc. 61-1 at 8) (emphasis added);

- "Don't talk shit. If a single hair on his [Sabeti's] head is touched, **we won't leave your parents alive**, you scumbags." (*Id.* at 17) (emphasis added);

- "We demand the revelation of the names of these three vile traitors to the people and the country. I wish they had been sterilized or tossed into the Persian Gulf for sharks to devour and get diarrhea" (*Id.* at 18);

- "We will deal with the sisters and mothers of these three commies" (*Id.* at 21); and

- "**These people won't stop harassing Iran and Iranians until they're dead.** We will not hold back in supporting Mr. Sabeti." (*Id.* at 30) (emphasis added).

Moreover, Plaintiffs' counsel has received death threats from an individual that the FBI determined to be in Iran. Doc. 60 at 5. And there are examples of these individuals on social media accessing publicly available court and counsel information from online resources and discussing how to discover Plaintiffs' true identities. *See*. Doc. 61-7 (screenshots of court information); Doc. 61-5 & 61-6 (Plaintiffs' counsel's information); Doc. 61-9 & 61-10 (discussion about how to discern Plaintiffs' identities in a YouTube video).

One individual, a Dr. Shahram Makoui ("Makoui"), posted the following to his X profile on February 25, 2025:

The first thing we will do in defense of His Excellency Mr. Parviz Khan Sabeti…**is to find, through the court in Orlando (Florida), the name, office address, and office phone number of that filthy lawyer who filed this complaint for those three terrorist murderers from the Fedai-Mojahedin**…and then, with thousands of fellow Iranians, **we will launch a campaign against him so that his entire life and everything he owns is reduced to ashes**…Then you'll see how that bastard, scammer, greedy lawyer tucks his tail between his legs and runs away! **Then we'll go after those three terrorists…and we'll bring upon them the very punishment that SAVAK, due to mercy, honor, and patriotism, did not inflict.** We will take revenge on those three criminals for all the victims of 1978.

Doc. 61-1 at 28 (emphasis added). Then, on March 10, 2025, he posted this message to X:

Last night…One of the greatest honors of my life was bestowed upon me…After 40 years of waiting…**With the help of a mutual friend…I spoke with Parviz Khan for 20 minutes** #Parviz_Sabeti_Hero_of_Iran

*Id.* at 29 (emphasis added). Alarmingly, Defendant concedes that he has spoken with Makoui and appears to downplay the unquestionably serious nature of Makoui's post. Doc. 55 at 17-18 ("To the extent that Makoui's social media posts *could be interpreted as calls to violence or harassment*, [Defendant] vehemently disavows such calls.") (emphasis added).

Makoui is not alone, however. Plaintiffs point to another X post in their response published by a Shahin Nejad ("Nejad"):

Undoubtedly, the complaint against His Excellency Parviz Sabeti is an attack on Aryamehr and on Pahlavism. The wave of Iranian nationalism and monarchism has peaked, and filing a complaint against the most well-known figure of SAVAK is a foolish attempt by

the leftist and Islamist terrorists of the 1960s and 70s to drain the energy of the true fighters against the Islamic Republic. Once again, the same nonsense about bears, ceiling fans, kebabs, and pulled nails!!! **These people won't stop harassing Iran and Iranians until they're dead. We will not hold back in supporting Mr. Sabeti.**

Doc. 61-1 at 30 (emphasis from Plaintiffs' Response). In his Affidavit, Defendant admits he has known Nejad, a political activist, for fifteen years and that it was Nejad who connected him to Makoui. Doc. 67-1, ¶¶ 3-5. However, Defendant insists that the call with Makoui was short and that its only purpose was to emphasize that Makoui's posts were inappropriate and that Defendant requested he "stop stoking political strife about this case." *Id.*, ¶ 5.

Defendant has also scoffed at Plaintiffs' allegations that they fear reprisal from both the monarchist faction of Iranians abroad and the present Islamic Republic. Doc. 55 at 3-4 ("To claim that [Defendant] is associated with the current Iranian regime which has sought his assassination and execution is absurd, alarming, and false."). But Plaintiffs have alleged in their Complaint that Defendant interviewed extensively with an Islamic Revolutionary Guard Corps ("IRGC")[6] journalist to publish a book within Iran with governmental approval. Doc. 47, ¶¶

---

[6] The Islamic Revolutionary Guard Corps ("IRGC") is "a branch of the Iranian Armed Forces." Doc. 47, ¶ 138.

153-54. This journalist continues to work in Iran and publish for IRGC-affiliated outlets. *Id.* Defendant's biographical documentary series was also produced by a filmmaker with IRGC ties.[7] *Id.*, ¶ 55. These claims raise credible questions regarding Defendant's possible connections with the current regime but, primarily, underline the inherent complexity of the political dynamic underlying these issues; it is entirely plausible that both Plaintiffs and Defendant face threats from factions within Iran.[8] *See* Doc. 55-1, ¶¶ 16-20; Doc. 60 at 5.

Again, however, whether Defendant himself is associated with the regime is beside the point. The issue here is whether Plaintiffs face credible threats of harm if they continue with this lawsuit under their actual identities. Upon consideration, there can be no question that filing this case has elicited a plethora of serious threats of violence and other harm against both Plaintiffs and their counsel. While the Court acknowledges Defendant's effort to pacify his supporters, his connection with some

---

[7] The FAC also alleges that a former Deputy Director for SAVAK was chosen to lead SAVAMA (allegedly the Islamic Republic's successor organization to SAVAK), demonstrating collaboration between the former SAVAK and the current Islamic Republic of Iran. Doc. 47, ¶¶ 124-30.

[8] Indeed, Defendant, too, alleges that he is a perpetual target of the contemporary Islamic Republic of Iran. Doc. 55 at 12-13. He has allegedly been marked for assassination, suffers repeated cyberattacks, is falsely accused of crimes, and is portrayed in propaganda in Iran as a national enemy. Doc. 55-1, ¶¶ 16-20. However, while the Court appreciates the gravity of these allegations, they are ultimately of little import to the question of whether Plaintiffs face threats of harm if their identities are revealed.

of the very individuals making these threats is deeply concerning. This factor continues to weigh heavily, if not determinatively, in favor of pseudonymity.

## 2. *Defendant's Status*

Defendant next argues that this Court erred in determining that his status as a previous government official diluted the reputational concerns normally associated with allowing plaintiffs to proceed anonymously against a private individual. Doc. 55 at 18-21 ("[Defendant] has not served in any government office since 1978…"). However, as the Court discussed in the Pseudonym Order, Plaintiffs' claims are entirely and exclusively based on Defendant's conduct in his official capacity with the SAVAK and the Committee in the 1970s. *See* Doc. 16 at 5-6.

Moreover, Defendant misconstrues this Court's analysis as applied to the corroborating sources which it has taken judicial notice of, including contemporaneous newspaper articles from the time period of Plaintiffs' alleged claims, government reports, published books, and online videos. *See* Doc. 55 at 20-21; Doc. 16 at 5-6. This Court is not, as Defendant posits, applying its "preferences and judgments about the popularity of [Defendant] to determine the purported quality of [his] reputation." Doc. 55 at 21. It is merely acknowledging that it is

indeed "undeniable that Defendant has been publicly accused of torture before."[9]

Doc. 60 at 15.

For instance, in a recent YouTube interview with Defendant's daughter, Dr. Pardis Sabeti ("Dr. Sabeti"), the interviewer acknowledged Defendant had a "particular political role" and that "there are a lot of people who don't like [Defendant], there's a lot of people who, as you said, are saying 'he's a killer,' are saying he's doing all those things. "[10] NUFDI, Dr. Pardis Sabeti, Iran Uncovered #12, YOUTUBE (Nov. 2, 2024), https://www.youtube.com/watch?v=RVZFi_0g_j8. (at 12:00). Dr. Sabeti answered that her family understood "the incredible lies and the propaganda" and noted that, at times, when she said good things about her father, people compared the veracity of her claims on the subject to that of hypothetical praise for Al Capone from *his* daughter. *Id.* at 12:48. The Court does

---

[9] Defendant even acknowledges that "many things have been written about me…[s]ome have been very critical of me." Doc. 55-1.

[10] Before this question, Defendant's daughter stated that there was significant positive reaction to Defendant's first public appearance in decades, despite his reputation:

> All these really positive comments came out. And it was this amazing thing for him to see and for us to see—people get it. People understand that his character is not what—they now understand what fake news is in a way that they didn't many many years ago. And they understand propaganda much better as well. And so it was nice for him to see that the majority of people were—understood that he was actually not a killer. Not—ya know—was a noble man trying to do a really hard job in a really awful situation.

NUFDI, Dr. Pardis Sabeti, Iran Uncovered #12, YOUTUBE (Nov. 2, 2024), https://www.youtube.com/watch?v=RVZFi_0g_j8. (at 9:34).

not opine on whether Defendant's reputation is deserved, but sources like this make clear that Defendant has had a reputation in public for some time that is closely associated with Plaintiffs' allegations. *See supra* notes 9, 10.

While Defendant's status as a private individual distinguishes him from active governmental officers, the conduct complained of was official government conduct. *See, e.g.*, Doc. 47, ¶¶ 38, 60, 65; *Stegall*, 653 F.2d at 185 ("are the plaintiffs seeking anonymity challenging government activity?"). This factor may be marginally neutralized by Defendant's distinction, but it is simultaneously clear that Plaintiffs' severe allegations against Defendant are no revelation. Whether deserved or not, these claims have been levelled at Defendant since the time he was in active government service. *See, e.g.*, Victor A. Lusinchi, *Torture and Denials of Rights Laid to Iran by Jurists' Group*, THE NEW YORK TIMES, May 29, 1976 (describing that a report by the International Commission of Jurists found political suspects in Iran "are subjected to psychological and physical torture" and, despite noting his denials, recognizing that "the much-feared Chairman Sabeti" played a key role in ordering political arrests) (internal quotations omitted).[11]

---

[11] Defendant refers to newspaper articles like this one as "pure, uncorroborated, third-party hearsay." Doc. 55 at 20. However, as the Court recognized above, these articles are not judicially noticed or cited for the truth of the matter asserted and are therefore not hearsay. *See* Fed. R. Evid. 801(c)(2). They merely offer public record support of Plaintiffs' allegations regarding Defendant's public reputation.

### 3. *Severity of Plaintiffs' Claims*

Defendant states that he has not been provided any unredacted information from the Plaintiffs which "could serve to corroborate their allegations concerning the fear or embarrassment of proceeding under their own names." Doc. 55 at 22. Yet, throughout the FAC, and unredacted portions of Plaintiffs' Declarations, there are serious allegations of plainly inhumane torture involving "stress positions, whipping, electrical shocks, being hung from the ceiling by his handcuffed wrists, and having weights hung from his genitals."[12] *See, e.g.*, Doc. 47, ¶ 101.

The Eleventh Circuit—albeit in a non-binding, unpublished opinion—has held that while "personal embarrassment alone" cannot justify proceeding under a pseudonym, "social stigma is sufficient to warrant proceeding anonymously." *Doe v. Neverson*, 820 F.App'x 984, 987-88 (11th Cir. 2020) (internal quotations and citations omitted). In the absence of any other binding authority on this question, Plaintiffs here have clearly articulated a fear of social stigma. *See* Doc. 60 ("This is readily apparent from Plaintiffs' declarations which state, unredacted, that this case concerns information they do not disclose to their own family, due to its distressing and stigmatizing nature and that talking about their experiences being tortured can,

---

[12] The Court acknowledges, however, that, in their Response, Plaintiffs clarify that John Doe III, although in high school at the time, was not a minor during the relevant period. *See* Doc. 60 at 17, n.16.

even now, cause extreme physical reactions."). Indeed, the FAC describes that despite years of therapy, John Doe II still "has post-traumatic stress reactions when he tries to talk about his torture, including full body shakes and feelings of dizziness." Doc. 47, ¶ 97.

Plaintiffs' request to proceed pseudonymously is not borne of petty fears of personal embarrassment, it arises from decades of alleged trauma and mental struggle to cognitively process the torture they experienced. *See, e.g.*, *id.* They fear the social stigma that will forever be attached to their names if they must publicly describe and relive the intimate, inhumane details of what they experienced. Doc. 60 at 17-19. Moreover, Plaintiffs allege that they continue to experience considerable mental and emotional struggles even just thinking about their experiences. 83-4, 96-7, 104 ("John Doe II's torture has left a deep and heavy psychological burden on him, where every day is its own struggle."). Indeed, though distinguishable, the instant circumstances bear analogy to instances where courts have allowed parties to proceed anonymously "in cases involving mental illness." *Neverson*, 820 F.App'x at 988.

In spite of Defendant's arguments to the contrary—including his misplaced contention that because Plaintiffs seek accountability under the TVPA for being tortured they must necessarily sacrifice their dignity in order to do so—the Court

continues to find it "plain that the deeply personal and scaring nature of Plaintiffs'
experiences weigh in favor of anonymity." Doc. 16 at 7.

*   *   *

Defendant's Motion for Reconsideration has not altered the Court's
conclusion that the "balancing of considerations calling for maintenance of a party's
privacy against the customary and constitutionally-embedded presumption of
openness in judicial proceedings" favors anonymity. *Stegall*, 653 F.2d at 186.
Though Defendant suffers some prejudice, "the threats of violence generated by
this case…[continue to] tip the balance" for Plaintiffs, particularly during the
opening phase of this litigation. *Id.*

However, as Defendant recognized, this Court has already determined that
Plaintiffs' willingness to divulge their identities to the defense for limited discovery
purposes is a factor in granting their request to proceed under pseudonyms. Doc.
16 at 9; Doc. 55 at 9-10. Moreover, Plaintiffs are agreeable to doing so, subject to a
protective order. Doc. 60 at 19, n.20.

Therefore, in the interest of justice and for the practical purpose of proceeding
with discovery on the statute of limitations issue, the Court will grant in part
Defendant's Motion for Reconsideration, subject to the Court's protective order.
Plaintiffs must share their identities with Defendant's **counsel** for the purpose of

statute of limitations discovery.[13]  *See Doe v. Islamic Salvation Front (FIS)*, 993 F.Supp.

3, No. 96–02792 (SS) (D.D.C. Feb. 3, 1998) (allowing anonymous plaintiffs suing

under the TVPA to remain anonymous after the defendant's motion to dismiss and

for nearly four years after the suit was filed); *see also id.* at Doc. 101 (D.D.C. Sept. 29,

2000) ("[I]t is time to amend the provisions of the Confidentiality Order that shield

the identities of the plaintiffs.").

### C. Conclusion

Accordingly, it is **ORDERED** that Defendant's Motion for Reconsideration is

hereby **GRANTED in part and DENIED in part**:

1. The parties **shall** abide by the attached **Protective Order** at

   Doc. 82-1;

2. For the reasons stated above, Defendant's Motion for Reconsideration

   is otherwise **DENIED without prejudice**; and

------------------------

[13] Plaintiff has raised substantial concerns regarding Defendant's close communication
with individuals making serious threats against Plaintiffs and their counsel, which are
compounded by his minimization of the seriousness of those threats. *See* Doc. 60 at 5-9; Doc. 55 at
18. For the initial phase of statute of limitations discovery, there is no need for Plaintiffs to
divulge their identities to Defendant. *See Doe v. Islamic Salvation Front (FIS)*, 993 F.Supp. 3, No. 96–
02792 (SS) (D.D.C. Feb. 3, 1998). This phase of discovery is limited solely to whether Plaintiffs
have exercised diligence in pursuing their rights and whether "extraordinary circumstances"
prohibited them from seeking redress within the statutory time period. *See Villareal v. R.J.
Reynolds Tobacco Co.*, 839 F.3d 958, 973 (11th Cir. 2016).

However, should Plaintiffs succeed in establishing an equitable tolling defense to the
TVPA's statute of limitations, they will be required to share their identities with Defendant for
discovery on the merits of their claim.

3. Upon request of the Defendant, the Court will revisit the issue of Plaintiffs' pseudonymous treatment after the closure of the first phase of discovery.

4. Defendant's Motion to Strike (Doc. 73) Plaintiffs' Second Request for Judicial Notice is **DENIED**.

**DONE** and **ORDERED** in chambers in Orlando, Florida on August 12, 2025.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties