UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN DOE I, AN INDIVIDUAL PROCEEDING BY PSEUDONYM; JOHN DOE II, AN INDIVIDUAL PROCEEDING BY PSEUDONYM; AND JOHN DOE III, AN INDIVIDUAL PROCEEDING BY PSEUDONYM;

Plaintiffs,

v. Case No.: 6:25-cv-00219-GAP-DCI

PARVIZ SABETI, AN INDIVIDUAL;

Defendant,
_________________________________/

## ORDER

This matter came before the Court on Defendant's Motion for Summary Judgment. Doc. 170; Doc. 180 (sealed motion & exhibits).[1] The Court has also considered Plaintiffs' Response in Opposition and Defendant's Reply. Doc. 182; Doc. 184; Doc. 185; Doc. 191.

Plaintiffs' Request for Judicial Notice and Defendant's *Daubert* Motion to Exclude the Expert Testimony of Dr. Golnar Nikpour, Plaintiffs' expert (along with

[1] For the sake of consistency, the Court will cite to Defendant's Motion for Summary Judgment in this Order as "Doc. 180", Plaintiffs' Response as "Doc. 184", and Defendant's Reply as "Doc. 191".

the associated Responses and/or Replies), are also before the Court. *See* Doc. 183; Doc. 189; Doc. 196; Doc. 192; Doc. 204.

## I. Background

### A. Procedural

On February 10, 2025, Plaintiffs John Doe I, John Doe II, and John Doe III ("Plaintiffs") filed suit against Defendant Parviz Sabeti ("Defendant") alleging that he is liable under the Torture Victim Protection Act ("TVPA") for the torture they suffered in Iran during the 1970s. *See generally* Doc. 1; Doc. 47 (Plaintiffs' Amended Complaint). On February 14, 2025, the Court granted Plaintiffs' *ex parte* motion for leave to proceed by pseudonym but acknowledged that Defendant would be entitled to object once he appeared in the case. *See* Doc. 16 at 9.

On April 14, 2025, after appearing, Defendant filed a motion to dismiss Plaintiffs' Complaint (and, subsequently, their Amended Complaint) on the grounds that their TVPA claims were precluded by the statute of limitations. *See* Doc. 40; Doc. 41; Doc. 47; Doc. 59. After denying Defendant's renewed motion to dismiss, the Court bifurcated the case to first consider the potentially dispositive issue of whether the doctrine of equitable tolling applies.[2] Doc. 81 at 16.

The Court then set the instant summary judgment briefing schedule for the

[2] Plaintiffs had also asserted several state tort claims against Defendant but the Court ultimately granted his motion to dismiss them pursuant to Florida's prohibition on giving extraterritorial effect to its laws. *See* Doc. 81 at 4-6.

parties and denied Defendant's motion for reconsideration of the Court's order granting Plaintiffs' request to proceed pseudonymously. *See id.*; Doc. 82. Again, the Court found that the "the threats of violence generated by this case continue to tip the balance for Plaintiffs[.]" *Id.* at 17 (internal quotations omitted). However, it ordered Plaintiffs to share their identities with Defendant's counsel under a Protective Order so that he could meaningfully conduct discovery on the equitable tolling issue. *Id.* at 17-18; Doc. 119-1. Moreover, the Court recognized that if Plaintiffs succeed "in establishing an equitable tolling defense to the TVPA's statute of limitations, they will be required to share their identities with Defendant for discovery on the merits of their claim." Doc. 82 at 18, n.13.

With the parties' briefing complete, the motions before the Court are ripe for adjudication. *See supra* at 1.

### B. Relevant Historical Background[3]

At the outset, a brief survey of Iran's turbulent history since the mid-twentieth century is warranted.

After a successful *coup d'etat* in 1953, Mohammad Reza Pahlavi (the "Shah") gained control of Iran's government (with considerable assistance from the U.S.

[3] The facts presented here are undisputed. *See* infra at II(B). Although Defendant contends that some facts should not be considered by the Court, he has offered no evidence to rebut any of those presented here—only unsupported assertions of unreliability, which the Court will address below. *See generally* Doc. 192; *see also* 180; Doc. 191.

Central Intelligence Agency ("CIA")).[4] *See* Doc. 182-4, ¶ 14. In 1957, the Iranian intelligence service—*Sazman-e Ettela'at Va Amniyyat-e Keshvar* (or "SAVAK")—was established to consolidate internal and external intelligence functions.[5] *Id.* Though primary opposition parties had been "essentially annihilated" early in the Shah's reign (after leadership were imprisoned, executed, or dispersed), by 1969 he had grown concerned with "subversive political groups"—communists/socialists, liberal nationalists (these first two categories are generally referred to as "leftists"), Kurds, other secessionist movements, and Islamist radicals. *Id.*, ¶ 17. It became the task of SAVAK's Third Division (in charge of internal security) to contain the threat posed by these factions. *Id.*, ¶¶ 15, 17.

By the early 1970s, these opposition groups were becoming increasingly militant and, in response, the Shah's government formed the *Komiteh-ye Moshtarek-e Zedd-e Kharabkar*—or Joint Anti-Sabotage Committee (the "Committee")—to

[4] *See also* Malcolm Byrne, *CIA Confirms Role in 1953 Iran Coup*, THE NATIONAL SECURITY ARCHIVE (posted Aug. 19, 2013) https://nsarchive2.gwu.edu/NSAEBB/NSAEBB435/; Dan Merica and Jason Hanna, "In declassified document, CIA acknowledges role in '53 Iran coup," Aug. 19, 2013, CNN, https://www.cnn.com/2013/08/19/politics/cia-iran-1953-coup/?hpt=po_c2 ("The military coup that overthrew Mossadeq and his National Front cabinet was carried out under CIA direction as an act of U.S. foreign policy, conceived and approved at the highest levels of government[.]") (quoting declassified document from the CIA's internal history of Iran from the mid-1970s).

[5] Again, the CIA has publicly acknowledged that it played a significant role in SAVAK's creation. *See* Doc. 182-4 at 8-9; "CIA's Role in Forming SAVAK," March 2, 1980, FREEDOM OF INFORMATION ACT ELECTRONIC READING ROOM, https://www.cia.gov/readingroom/document/cia-rdp90-00552r000505290007-5 ("A classified Senate Foreign Relations Committee report confirms the CIA's role in forming SAVAK. It says the CIA provided the Shah money, as well as training, for that purpose.").

consolidate the work of SAVAK, the gendarmerie, the military, and the National Police Force agencies. *Id.*, ¶¶ 17-18. The Committee, housed in a prison and interrogation center in Tehran, "developed a notorious reputation as a den of torture and brutality[.]" *Id.*, ¶ 18. Activists, intellectuals, artists, and other dissidents were imprisoned, abused, and tortured by SAVAK and the Committee during the early 1970s. *Id.*, ¶¶ 18-19, 23-24 (citing several high-profile examples).

During this time period "the Pahlavi monarchy took on increasingly autocratic tendencies"—"there were no legal means through which to challenge SAVAK torture in Iran in [the Shah's] courts[.]" *Id.*, ¶¶ 14, 23. Instead, survivors and activists looked to global human rights organizations, foreign nations, and bodies like the United Nations ("U.N.") to shed light on the Shah's abuses. *Id.*, ¶ 23. Indeed, a 1976 report by the International Commission of Jurists recognized the dire situation under the Shah based upon "[t]he number of detailed allegations which ha[d] been made, the absence of any impartial investigation, and the fact that the SAVAK is, and knows itself to be, a law unto itself[.]" *Id.*, ¶ 24; *see also* Doc. 182-6.

Increasing pressure from these outside groups eventually lead to the Shah's implementation of justice reforms in the late 1970s and even the release of some political prisoners. *Id.* In 1978, despite the Shah's dismissal of scores of senior SAVAK officials in attempts to appease his critics, opposition to the Shah culminated in mass demonstrations which crippled his government. *Id.*, ¶¶ 24-30.

By February of 1979, the Shah had fled Iran and, led by Ayatollah Ruhollah Khomeini ("Khomeini"), the country transitioned to the Islamic Republic of Iran ("IRI")—under Khomeini's absolute rule. *Id.*

Despite some scholars referring to the mass movement which toppled the Shah as a "revolution against torture[,]" the IRI began repurposing its predecessor's tools of repression to its own ends "immediately[.]"*Id.*, ¶ 25. Indeed, in the early days after the Revolution Khomeini expanded the practices of torture and forced confessions "against not only Pahlavi loyalists but also many of [his] former allies in the anti-[S]hah opposition[.]"[6] *Id.*, ¶¶ 25-31. Activists, political prisoners, and human rights organizations began recognizing the "disturbing continuities between the pre- and post-revolutionary governments, with a particular focus on torture" as early as 1980.[7] *Id.*, ¶ 29.

The IRI's "wave of oppression" throughout the 1980s led to an "onslaught" of political executions, culminating in the 1988 massacre of thousands of political

---

[6] Plaintiffs' historical expert, Dr. Golnar Nikpour ("Dr. Nikpour"), reported that many Iranians would have watched "former friends and fellow travelers arrested, tortured, paraded onto television to disavow their beliefs, and killed." Doc. 182-4, ¶ 34. During this period "many intellectuals also lost their jobs, as the new regime undertook a cultural revolution across Iranian institutions and universities." *Id.*

[7] One person described in an Amnesty International press release that "[n]o one knew that those patriots who survived the Shah would now be facing Khomeini's death squads." Doc. 182-4, ¶ 29. The same press release stated that many of those being newly incarcerated in the IRI "had been foremost in the opposition to the government of the Shah and had suffered imprisonment at that time for their political beliefs." *Id.*

prisoners.[8] *Id.* at 25. This era "elicited a new wave of fear and paranoia among those who opposed the [IRI]" and many surviving activists were left with no option other than to flee the country. *Id.*, ¶¶ 34-35. The IRI remains in power to this day, continuously targeting protestors and political opposition for execution and harassment both within Iran and extraterritorially. *Id.*, ¶¶ 35-36. Indeed, with the expansion of internet-based technology, "[r]eports abound" of the IRI surveilling and coming after "Iranians living abroad for voicing opinions critical of the [IRI]."[9] *Id.*, ¶ 36.

**C. Defendant's History**[10]

Defendant led the Third Division of SAVAK as the Director of Internal Security for at least the five years preceding the Revolution. *See* Doc. 170-91 at 20:8-

---

[8] *See* Doc. 182-4, ¶ 33 ("Although the leftist movement in Iran was aggressively targeted by SAVAK before 1979 and decimated by the time of the collapse of the monarchy, Islamist revolutionaries nonetheless saw their leftist counterparts—both among the secular and religious left—as threats to their aspirations for power[.] … Between 1981 and 1985, the revolutionary government executed 8,000 political opponents, targeting the Islamic left, Islamic liberals, liberal nationalists, the secular left, and ethnic minority parties and all but annihilating a generation of activists in Iran.").

[9] *See* Doc. 182-4, ¶ 36 ("Like its predecessor, the [IRI] intelligence forces have repeatedly revealed themselves to be able to reach far beyond Iran's borders…State-sponsored hackers have even impersonated human rights organizations, tech companies or other activists to lure their targets into a false sense of security…thousands of Iranians within the diaspora are being targeted.").

[10] The Court records this undisputed history only as it is relevant to the instant matter of equitable tolling—it does not purport to find any facts regarding Plaintiffs' claims on the merits.

24, 131:6-7 ("[T]he third department, I was last five years director.");[11] Doc. 170-111 at 6 ("In little more than a decade, he became the omnipotent head of the organization's crucial Third Division, in charge of internal security."). But as the Shah's power fragmented in the fall of 1978, Defendant was eventually removed from his position. *Id.* at 19:14-20:1, 20:25-21:4. In November 1978, after declining the Shah's offer of a Hungarian ambassadorship, Defendant fled to Switzerland. *Id.* at 22:2-23:6. He eventually came to the United States. *Id.* at 23:7-24:1.

Upon arrival in the U.S., Defendant first lived in New Jersey, followed by a stay in Hawaii, but eventually relocated to Florida to pursue the real estate business. *See id.* at 35-41. He openly admits that during his first five years in the United States he "maintained a low profile because the [IRI] was hunting him." Doc. 180, ¶ 38. Indeed, Defendant testified that he fled Hawaii because an Iranian "fugitive" recognized him and he was concerned for his safety. *Id.*, ¶¶ 40-41. And Defendant once moved to Georgia for eight months because he had grown suspicious about his residence in Florida. *Id.*, ¶¶ 40-42.

By 1985, Defendant—who was living under his own name, apart from his occasional use of the anglicized nicknames "Mark" and "Peter"—began to appear

[11] The Court recognizes Defendant's counsel's objection to this question during his deposition as outside the scope of the instant discovery order. *See* Doc. 170-91 at 130-131; *see also* Doc. 137. However, his objection to this question regarding Defendant's role in the Shah's government is overruled to the extent he simply affirmed his position at the time, which is relevant background to the instant motion. *See id.*

in Florida public records on various mortgage, power of attorney, and business documents. *Id.*, ¶ 46. In 1990, Defendant was involved in a car accident which occasioned press coverage and, eventually, a 1991 (public) lawsuit in which Defendant appeared under his own name. *Id.* Defendant also made political donations (and attended some events) over the decades, which are matters of public record.[12] *Id.*, ¶¶ 50-52.

Little other indicia of Defendant's whereabouts or activities since leaving Iran is present in the record apart from a reported private interview he gave to an author in California in 2002,[13] an audio-only interview to the Voice of America's ("VOA's") Persian Service in 2012, a published (written) question and answer interview with Erfan Qaneei (or Ghanei) Fard ("Fard") (also in 2012),[14] and a recorded video interview in 2014 to *Timeline Iran* (which was not published until 2023, at Defendant's request). *See* Doc. 184, ¶ 63; Doc. 191 at 7-8. Notably, however, Defendant's appearances in the public record became scarce beginning in 2012,

---

[12] The mailing address he listed for the vast majority of his political donation records is a P.O. Box in Orlando. *See* Doc. 170-105; Doc. 170-106.

[13] Indeed, the author to whom Defendant gave an interview in 2002 described his life in exile as hidden by "calculated disinformation." Doc. 170-111 at 7.

[14] Plaintiffs have pointed to the fact that Fard is "an IRGC [Iranian Revolutionary Guard Corps]-affiliated journalist" who spent 160 hours interviewing Defendant. Doc. 47, ¶ 153. Fard went on to publish a book, titled *Dar Damgahe Hadese* (In the Midst of the Crisis) recounting these interviews with Defendant, but regarding his present whereabouts, it only indicated that Defendant "remained out of public view and lived a low-profile life in exile[.]" Doc. 182-15 at 2.

around the time of the interviews he gave to the VOA and Fard. *See, e.g.*, Doc. 170-120; Doc. 170-121.

On February 11, 2023, Defendant's daughter, Dr. Pardis Sabeti ("Dr. Sabeti")—a Harvard/MIT geneticist—posted several photographs to X of herself with Defendant and his wife (without his permission) at a Miami protest under the caption: "44 years ago today, our native country fell into darkness. Hoping this year brings light and solidarity[.]" Doc. 182-49 at 2; *see* Doc. 170-91 at 124:13-125:4; Doc. 180, ¶¶ 51, 57. Defendant recalled in his testimony that the next day he saw "one million people ha[d] already looked and s[een] inside Iran[,]" and his daughter described it in a 2024 interview as his coming "out of the woodworks." Doc. 170-91 at 124:23-125:19; Doc. 170-93 at 8:54-9:08. He has since made other public appearances, including in an hours-long interview with Manoto TV—a diasporic television station based in England. *See* Doc. 170-91 at 100-03; Doc. 170-92; Doc.182-4, ¶ 39.

**D. Plaintiffs' History**

*1. John Doe I*

John Doe I alleges that while he was a university student in 1974, he was arrested and subsequently tortured and held by SAVAK until 1978. Doc. 184, ¶ 4. Beginning in 1980, after the Revolution, John Doe I's home was raided three times by the IRI and he was forced to flee to [redacted] after learning he "would have been

subject to summary execution" because the IRI was targeting Shah-era political prisoners. *Id.*, ¶ 17. He was soon warned that an "IRI assassination team had been dispatched to kill him" and his family remaining in Iran were detained, imprisoned and questioned until they, too, fled the country. *Id.*, ¶¶ 18-19.

John Doe I spent several years living in [redacted] as a refugee before his asylum case was processed; he finally arrived in the United States in [redacted]. *Id.*, ¶ 20. Despite his primary focus on his family's safety, John Doe I has participated in [redacted] demonstrations over the years advocating for human rights and condemning the kind of conduct which he allegedly suffered. *See* Doc. 180 at 8-12. He often did so alongside [redacted].[15] Doc. 180-2 at 90-92; *see also* Doc. 180, ¶ 4.

Until 2023, John Doe I did not think about Defendant or filing a lawsuit against him.[16] *See* Doc. 180, ¶ 3-4. His reluctance to do so was primarily occasioned by his continuous fears of retaliation from the IRI, Defendant himself, and elements of the diaspora which support the Shah's dynasty. *See* Doc. 184, ¶¶ 21-26; Doc. 180-

[15] Indeed, [redacted] appears to largely be a result of the blurred and overlapping political allegiances that exist among opposition to the IRI [redacted] in addition to the fact that these events were more broadly focused on protesting the abuses of the IRI. *See* Doc. 180-2 at 98-100; *see also generally* Doc. 182-19 at 22-44.

[16] Indeed, due to the traumatic nature of his alleged experiences, John Doe I did not even share them with his family until filing this lawsuit. *See* Doc. 180-2 at 130:2-10.

2 at 132 at 10-12 ("During all those years since I was released from the prison till today, all of my thoughts are protecting myself and my family."). He also had no knowledge of Defendant's whereabouts or status. *See* Doc. 180-2 at 214 (John Doe I recounting that he had heard about Fard's published interview but never knew about the VOA interview—neither of which disclosed Defendant's location).

In his mind, filing a lawsuit against Defendant entails much more significant risk than "participating as an anonymous dissident in urban protests supportive of human rights[.]" Doc. 184, ¶ 44. Nevertheless, once Defendant appeared for the first time in 2023, he resolved "that this could be the last chance [he] would be able to defend [his] rights."[17] *See* Doc. 180-2 at 127:2-128:16. But "he only proceeded because of the support of his co-plaintiffs" and, since this lawsuit's filing, he "has kept a low profile and no longer attends Iranian political events[.]"[18] Doc. 184, ¶ 26.

---

[17] *See* Doc. 180-2 at 127:2-128:16 ("[B]ecause when I saw the picture of [Defendant] in the press, it took me back to the prison of the committee. I lived all the proceedings of prison and torture and everything that I remember from the prison, and it is not pleasant—not for you, not for myself—because it destroyed the life of me and the life of my family. And when I saw it, I felt that every single lash I received and beatings I received, and all pain and suffering in every second, every moment—not only for me but for my family. And all the things that I witnessed in the place of torture, I lived again, it returned to me again, and therefore I thought that this could be the last chance I would be able to defend my rights. And I thought to myself that it was not justice about me, who was, I was a student and I didn't do anything and I received and I suffered that calamity. Also, I'm talking about my children, my grandchildren, and other children of other Iranians. It is not good that they suffered the same thing again…I don't want anybody to suffer again, these things, whoever they are. People of Iran should know this—should know what happened to that generation, and this is part of our history[.]").

[18] John Doe I has never felt safe to return to Iran and "understands that he continues to be surveilled by the IRI[.]" Doc. 184, ¶¶ 21-22. Indeed, the IRI "has threatened [him] repeatedly to

2. *John Doe II*

John Doe II alleges that he was arrested, tortured, and imprisoned by SAVAK "numerous times in the 1970s because of his artistic expressions and political beliefs." Doc. 184, ¶ 5. In particular, he endured a [redacted] period of incarceration and torture beginning in 197[redacted] which resulted in his hospitalization and permanent disfigurement and disability. *Id.* Following the Revolution, John Doe II was arrested by the IRI for [redacted], and "it was made clear that he would be imprisoned if he did not align [redacted] with the regime." *Id.*, ¶ 27. After IRI security personnel raided his [redacted] and tried to arrest him, fearing execution, he went into hiding until he could escape ([redacted]) to [redacted] in 198[redacted]. *Id.*, ¶¶ 27-28.

John Doe II lived in [redacted] years before arriving in the United States in 19[redacted]. *Id.*, ¶ 28. He initially lived in [redacted] but, after being confronted by supporters of the Shah's dynasty and threatened for his [redacted] beliefs, he moved away for his safety. *Id.*, ¶ 30. Like his co-plaintiffs, John Doe II persisted in advocating for human rights despite the intense trauma and fear he has lived with ever since he was tortured, though he acknowledges that he does so in a "calculate[ed]" manner and "think[s] twice" before criticizing the Shah's

---

[redacted]" *Id.*

government or the IRI.[19] *See* Doc. 180-17 at 190:15-191:1; *see supra* at note 48. Along with his [redacted] work, [redacted], and [redacted] articles, he [redacted]. Doc. 184, ¶ 47.

Along with the obvious threats he's received from supporters of the Shah's dynasty, John Doe II maintains that the IRI has explicitly threatened his friends and colleagues from the Shah era, "even in exile[,]" and has never returned to Iran because he does not feel safe to. *Id.*, ¶ 28-29. Nor "does [he] believe that residing in the U.S. protects him from harm by the IRI." *Id.* Moreover, since "receiving threats in connection with this case…[he] has isolated himself and is very careful when leaving his home." *Id.*, ¶ 32.

3. *John Doe III*

John Doe III alleges that he was arrested by SAVAK and military personnel in 197[redacted]—during [redacted]. Doc. 184, ¶ 6. He was tortured for one week and left to endure two months of solitary confinement. *Id.*

After the Shah was deposed, John Doe III was "investigated and targeted" by the IRI because he was a former political prisoner. *Id.*, ¶ 33. He fled to [redacted]

[19] *See* Doc. 180-17 at 190:15-191:1 ("I had this fear all the time with me, and I—I would say this fear is, like, a sixth sense to me. And like I said before, I have—after 50 or almost 50 years, I have still nightmare at night, and I have seen my fear, my experience, my suffering before I left Iran and after I left Iran is still with me. So it—it's always with me, that fear. But I, as I said before, I have commitment to do that. And I did. And I'm still here, and I go to the end.").

where he was able to obtain a U.S. [redacted] visa, eventually [redacted] in 19[redacted]. *Id.*, ¶ 34. However, only a year or two later, he and his family were physically assaulted [redacted] *Id.*

Despite living in fear of the IRI and Defendant (along with factions of the Shah's supporters) "for the last four decades", John Doe III considers it a human duty to speak out against human rights abusers. Doc. 180-43 at 96:10-97:10 ("Yes. [Despite my fear], this is what I'm mostly mainly concerned…to raise my voice about human rights and—and violations of human rights."). John Doe III also testified that before Defendant appeared in 2023, nobody had any way of knowing how to find him. *See* Doc. 180-43 at 6-10 ("There was no contact or discussion before 2023 because we were of the—nobody knew if [Defendant] is alive or dead or of where he was, but we also have this sense of fear of the—this matter."). Once Defendant "came to light" John Doe III coordinated with his co-plaintiffs because he "was thinking that this may be a lifetime opportunity for us to get justice." Doc. 180-43 at 210:19-211:24 ("It was just a matter of human rights and standing up for human rights and to get justice.").

John Doe III has never returned to Iran "[o]ut of fear for his life and his family" and, likewise, "does not believe that residing in the U.S. protects him from harm by IRI agents[.]" Doc. 184, ¶ 36.

## II. Analysis

First, the Court will address the threshold matters of Plaintiffs' Request for Judicial Notice (Doc. 183) and Defendant's *Daubert* Motion (Doc. 192). After resolving the evidentiary disputes, the Court will proceed to its analysis of Defendant's Motion for Summary Judgment (Doc. 180).

### A. Plaintiffs' Request for Judicial Notice

Consistent with previous rounds of briefing in this case, Plaintiffs request that the Court take judicial notice of 37 documents "for the purpose of establishing their existence, their public availability, their authorship and date of publication, and the fact that they contain the statements set forth therein."[20] Doc. 183 at 2. Defendant predictably opposes their introduction, once again arguing that Plaintiffs are trying to backdoor hearsay evidence under judicial notice provisions.[21] Doc. 189 at 5.

---

[20] Federal Rule of Evidence ("FRE") 201(b) allows courts to take judicial notice of an adjudicative fact that: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Though adjudicative facts are typically established through evidence and testimony, where "particular facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary." *Id.* "A high degree of indisputability is the essential prerequisite." *Id.*

[21] Defendant also objects that Plaintiffs have not identified "any specific facts within the referenced documents that they contend are relevant[,]" but he goes on to produce a chart

However, as it has consistently ruled, the Court will "grant Plaintiffs' request and take[] judicial notice of the exhibits listed [in its Request,] not for the truth of the matters asserted therein, but for their existence."[22] *See, e.g.*, Doc. 82 at 5-7; *see also Turner v. Wells*, 879 F.3d 1254, 1272, n.5 (11th Cir. 2018) (affirming taking judicial notice of videos and news articles written about party, but not for the truth of the matters they assert); *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (taking judicial notice of Florida Department of Corrections documents because "[a]bsent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports") (quoting *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n. 4 (5th Cir.1981)).

The Court likewise takes judicial notice of and considers all of Defendant's proffered news articles (regarding his daughter and other subjects). *See infra* at 32, 50.

### B. Defendant's *Daubert* Motion to Exclude Expert Testimony of Dr. Golnar Nikpour

(covering five pages) which lists the specific quotations and facts upon which Plaintiffs rely. *See* Doc. 189 at 6-10.

[22] Moreover, it is likely that many of these documents would qualify for exceptions to the rule against hearsay. *See, e.g.*, Fed. R. Evid. 803(20). Subsection 20 of FRE 803 recognizes that statements describing "[a] reputation in a community…concerning general historical events important to that community, state, or nation" are exceptions to the rule against hearsay. *See U.S. v. Belfast*, 611 F.3d 783, 821 (11th Cir. 2010) (affirming the district court's admission of "testimony concern[ing] nothing more than historical background about Liberia and its political structure, as necessary to educate the jury" under FRE 803(20)).

In support of their Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiffs retained an expert witness, Dr. Golnar Nikpour ("Dr. Nikpour") to prepare a report on Defendant "and the significant risks posed to those Iranian intellectuals, activists, and members of the political opposition who speak out against both Iranian monarchists and the Islamic Republic of Iran." Doc. 182-4, ¶¶ 9-13. Defendant seeks to exclude Dr. Nikpour's testimony. *See* Doc. 192.

**1. Legal Standard**

Federal Rule of Evidence 702 governs the admission of expert witness testimony. When applying this rule, the Court plays an important "gatekeeping" function to ensure that proposed expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "District courts are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation, expert testimony." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328–29 (11th Cir. 2014) (internal citations omitted).

Accordingly, District courts must engage in a "rigorous three-part inquiry" to determine admissibility. *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010). This inquiry requires the Court to assess whether:

> (1) the expert is qualified to testify competently regarding the matters she intends to address;
> (2) the methodology by which the expert reaches her conclusions is

> sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (citations omitted). Ultimately, "[t]he proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong" of this inquiry. *Id.*

**2. Discussion**

Though he vaguely asserts that Dr. Nikpour "has never given serious scholarly attention to Defendant"—despite immediately citing to three such examples—Defendant does not meaningfully object to her qualifications.[23] *See* Doc. 192 at 4; *Hendrix*, 609 F.3d at 1194. Indeed, Dr. Nikpour is eminently qualified to opine on this subject matter: (a) she is an Associate Professor of History at Dartmouth College; (b) she conducts research "on the history of modern Iran, including the development of state power, incarceration, political repression, and rights across the twentieth and twenty-first centuries" and has presented "more than 50 times on these issues[;]" (c) she has taught collegiate courses including "Modern Iran[,]" and the "Global History of Human Rights[;]" and, (d) among countless other qualifications, Dr. Nikpour published a book titled *The Incarcerated*

[23] Defendant's suggestion that because Dr. Nikpour's career hasn't been solely focused on Defendant she amounts to some manner of "pseudo-historian" has no legal support. *See* Doc. 192 at 4; *see generally Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854-55 (11th Cir. 2021).

*Modern: Prisons and Public Life in Iran*, which was published by the Stanford University Press in 2024. *See* Doc. 182-4, ¶¶ 1-8.

Moreover, Defendant offers little genuine resistance to the concept that historical expertise is helpful to the Court in synthesizing nearly 50 years of Iranian history in relation to this case. *See generally* Doc. 192. It goes without saying that courts "are not expert[s] at history" and Dr. Nikpour's opinions, informed by a career focused on modern Iranian history with a specialization in incarceration, are obviously helpful to the Court. *McDonald v. City of Chicago*, 561 U.S. 742, 914 (2010) (Breyer, J., dissenting). However, it is equally clear that where Dr. Nikpour's opinions venture into the territory of "legal conclusions" or embrace issues tangential to the question of the propriety of equitable tolling, they will be disregarded as unhelpful. *See, e.g.*, Doc. 192 at 16 ("these opinions are not helpful and should be excluded…because they opine on a legal conclusion").

Defendant's Motion focuses on his contentions that various opinions and conclusions in Dr. Nikpour's Report are unreliable. *See generally* Doc. 192. First, Defendant's general objection to the Report's reliability based on the fact that "Dr. Nikpour…deviated from her usual research process for this Report…[because] she conducted no…archival research for [it]" is unavailing. *Id.* at 5. The Eleventh Circuit has plainly upheld the admission of expert testimony "based upon publicly available sources" (including from the State Department) in similar matters. *See*

*Carrizosa v. Chiquita Brands Intl., Inc.*, 47 F.4th 1278, 1320 (11th Cir. 2022) (citing *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 22-23 (D.D.C. 2008)). Dr. Nikpour's opinions in relation to the background history of Iran over the past 50 years, the SAVAK and its history of torture, and Defendant's disappearance and recent reemergence are reliable opinions derived from her historical expertise and consultation (and citation to) substantial publicly available sources.[24] *See id.*; *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021); *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001).

For instance, Dr. Nikpour's opinion regarding Defendant's "enduring legacy" is plainly admissible and helpful to this Court—that Plaintiffs may not be Defendant's victims (which the Court is not considering in this phase of the case) is irrelevant to the reliability of Dr. Nikpour's opinion. *See* Doc. 192 at 6-11; Fed. R. Evid. 803(21) (testimony regarding "[a] reputation among a person's associates or in the community concerning the person's character" is not excluded by the rule against hearsay). This opinion does not "tell the jury what result to reach[;]" on the contrary, it simply reports one of Dr. Nikpour's conclusions, based upon the

[24] "A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury[—v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001). Defendant has asserted several arguments against the reliability of the Report which ignore this principle. Defendant's qualms are matters for cross-examination—which it has had the opportunity to conduct—not admissibility. *See id.*; Doc. 180-86.

entirety of her preceding report (which is, in turn based upon her own extensive research on these subjects).[25] *See generally* Doc. 182-4; Doc. 192 at 8 (quoting *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)); *see also* Fed. R. Evid. 803(21).

Defendant also contends that Dr. Nikpour "purports to opine as to why these Plaintiffs 'have never been able to seek remedy within the Iranian legal system.' " Doc. 192 at 9. Her Report does nothing of the sort. *See generally* Doc. 182-4. Dr. Nikpour provided expert testimony about Defendant and the conditions faced by leftist political dissidents in Iran over the past 50 years—her Report contains no opinions regarding "these Plaintiffs." *See id.*

Dr. Nikpour, a qualified historian, has produced a Report based upon reliable historical methods which is helpful to the Court for these contextual purposes.[26] *See* Doc. 182-4; *see, e.g.*, *Carrizosa*, 47 F.4th at 1320. Of course, the Court does not accept any of the Report's conclusions regarding the legal issues presented in this matter,

[25] As Plaintiffs retort, Dr. Nikpour's opinions "are the product of applying rigorous scholarship methods, including reading and assessing primary and secondary sources, historical data, and archival material, and performing qualitative analysis to identify synergies in the records and understand the commonly held assumptions and views of the subjects of her research." Doc. 204 at 9. Moreover, Defendant's attempt to somehow import scientific causation concepts from tort law to disqualify Dr. Nikpour's opinions regarding Defendant's legacy are unavailing—as Plaintiffs recognized, Defendant was free to retain his own expert to opine on his legacy, but he did not. *See id.* at 14.

[26] This historical context includes general modern Iranian political history since the 1970s, access to justice in Iranian courts, and the general history of the Iranian diaspora (including exiles and supporters of the exiled Pahlavi monarchy) during this time period.

but Defendant's repetitive and erroneous classification of Dr. Nikpour's conclusions as such is misplaced. *See, e.g.*, Doc. 192 at 15. Dr. Nikpour's Report is admissible expert testimony to the extent that it provides background historical context to this matter.[27]

### C. Defendant's Motion for Summary Judgment

#### 1. Legal Standard

A party is entitled to summary judgment when the party can show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court is not, however, required to

[27] For the sake of clarity, the Court analyzes the admissibility of Dr. Nikpour's report only as to the statute of limitations and equitable tolling questions presently at issue—the Court does not, at this juncture, consider the Report's admissibility under *Daubert* in regards to the merits of Plaintiffs' claims under the TVPA.

accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458–59 (11th Cir. 1994).

"A district court possesses the power to enter summary judgment *sua sponte* provided the losing party 'was on notice that she had to come forward with all of her evidence.' " *Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986)). Indeed, "so long as the party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment *sua sponte* is entirely appropriate." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1327, n.12 (11th Cir. 2023) (quoting *Burton*, 178 F.3d at 1204).

**2. Equitable Tolling & the TVPA[28]**

"Claims brought under the TVPA are subject to a ten-year statute of limitations…[P]laintiffs therefore had to bring their claims—at the latest—by March of 2002, ten years after the enactment of the TVPA." *Camps v. Bravo*, 142 F.4th 743,

[28] The TVPA requires that plaintiffs exhaust "adequate and available remedies in the place in which the conduct giving rise to the claim occurred." *See* 28 U.S.C. § 1350, notes, sec. 2(b). But Congress has recognized that "in most instances the initiation of litigation under this legislation will be virtually *prima facie* evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred." *Jean v. Dorelien*, 431 F.3d 776, 781-82 (11th Cir. 2005). In any event, "[t]he ultimate burden of proof and persuasion on the issue of exhaustion of remedies…lies with the defendant." *Id.* at 782. Not only is it plain here that "local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile[,]" but Defendant has not raised the issue so the Court considers it no further. *Id.*; *see infra*; *see generally* Doc. 180; Doc. 59.

749-50 (11th Cir. 2025).

In the Eleventh Circuit, courts "look to the relevant statute for guidance determining whether equitable tolling is appropriate in a given situation."[29] *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006). The TVPA "promote[s] the protection of human rights internationally" and was enacted by Congress "to carry out obligations of the United States under the [U.N.] Charter and other international agreements pertaining to the protection of human rights…" *Id.* (quoting Pub. L. No. 102–256, 106 Stat. 73). "Absent a cause of action in the United States courts, some of the most egregious cases of human rights violations might go unheard because regimes that commit the most serious human rights abuses often possess the most woefully inadequate legal mechanisms for redressing those abuses." *Id.* at 1261-62.

Little more than a year ago, the Eleventh Circuit made plain that the TVPA "explicitly calls for consideration of all equitable tolling principles…with a view toward giving justice to plaintiff's rights." *Camps*, 142 F.4th at 750 (quoting S. Rep. No. 102–249, at 10–11 (1991)). "The doctrine of equitable tolling allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiff's claims." *Id.*

---

[29] "The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one of legislative intent whether the right shall be enforceable…after the prescribed time." *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428 (1965) (internal quotations omitted).

at 750 (quoting *Arce*, 434 F.3d at 1268).

The doctrine applies when a plaintiff demonstrates that his delay bringing suit is due to "[1] extraordinary circumstances that are both beyond his control and [2] unavoidable even with diligence." *Id.* (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999)). This is a "fact-specific determination because a finding of extraordinary circumstances necessary for equitable tolling is reserved for extraordinary facts." *Id.* (quoting *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154–55 (11th Cir. 2005)) (brackets and internal quotation marks omitted).

Among the "[i]llustrative but not exhaustive types of tolling principles which may be applicable" in the TVPA context, a Senate report on the Act recognized that the statute of limitations should be tolled "where the defendant has concealed his or her whereabouts[.]" *Id.* The Eleventh Circuit has also held that the TVPA's statute of limitations "should be tolled…while the regime that perpetrated the abuses remains in power." *Id.* (citing *Arce*, 434 F.3d at 1262-63). Indeed, in *Camps v. Bravo*, it explicitly recognized that the plaintiffs' fears of reprisal for seeking justice tolled the statute of limitations until a democratic government had effectively established itself. *Id.* at 751.

"As to the diligence inquiry, [the Eleventh Circuit] ha[s] stated that the diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.' " *Dotson v. U.S.*, 30 F.4th 1259, 1260 (11th Cir. 2022)

(quoting *Holland v. Florida*, 560 U.S. 631, 653 (2010)) (other citations and quotations omitted) (cleaned up). Nevertheless, "the principles of equitable tolling…do not extend to…a garden variety claim of excusable neglect." *Id.* (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)).

Defendant moved for summary judgment arguing that the undisputed facts show that there are no extraordinary circumstances to toll the statute of limitations and that, even if there were, because they never looked for Defendant before 2023, Plaintiffs were not diligent in pursuing their rights. *See* Doc. 170. Plaintiffs contend that extraordinary circumstances support their delay in bringing suit against Defendant before 2025, and that they have been diligent in pursuing their rights despite not looking for Defendant before 2023. *See* Doc. 184.

**3. Extraordinary Circumstances**

As to the first prong, two distinct extraordinary circumstances justify equitable tolling of the TVPA's 10-year statute of limitations: Plaintiffs' fear of reprisal and Defendant's concealment of his whereabouts until 2023.

**a) Fear of Reprisal**[30]

[30] Defendant has not raised any disputed fact which would rebut Plaintiffs' position (which is supported by the record) that fear of reprisal—and not the inability to find Defendant—was the primary impediment to filing their claims within the TVPA's statute of limitations. *See, e.g.*, Doc. 184 at 32-40; Doc. 180-2 at 215-16 (John Doe I describing when "you don't have a place to be safe…it is hard to do that kind of stuff…[like] [f]iling the lawsuit against the person running SAVAK"); Doc. 180-17 at 176:14-18 (John Doe II stating that "the most important [thing] to [overcome is] the fear…I really scared to say yes"); Doc. 180-43 at 212:6-10 (John Doe III testifying that "[t]here was no contact or discussion before 2023 because…nobody knew if Sabeti was [wa]s dead or alive or []

### i. Repressive Regimes

This case stands apart from the Eleventh Circuit's TVPA jurisprudence. Most of those cases relied upon a clear end-point to an authoritarian regime's power which paved the way for at least some degree of societal and/or judicial reconciliation. *See, e.g.*, *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) (holding that equitable tolling applied "during the military regime in Haiti from 1991 to 1994" and that the plaintiff's claims filed in 2003 were thus timely); *Cabello*, 402 F.3d at 1155-56 (holding that "[u]ntil the first post-junta civilian president was elected in 1990, the Chilean political climate" precluded plaintiffs from pursuing their rights and their 1999 filing was timely); *Arce*, 434 F.3d at 1264-65 (holding that the district court "did not abuse its discretion by tolling the statute of limitations until the end of the civil war in 1992"); *Camps*, 142 F.4th at 751 (holding that statute of limitations was "correctly tolled" until 2005, *decades after* a democratic government arose, because "the military remained influential and protected by amnesty laws until 2003").

In this case, no end point has ever materialized—two, overlapping authoritarian regimes have remained in power in Iran since Plaintiffs were tortured approximately fifty years ago. *See, e.g.*, Doc. 182-4, ¶¶ 25-26. And though the facts

---

where he was, but we also have this sense of fear of…this matter."); *see also generally* Doc. 180, Doc. 191.

underlying Plaintiffs' lawsuit arose under the Shah's regime, the IRI which replaced him has built upon that troubling legacy—in fact, the IRI has almost certainly exceeded it.[31] *See id.*, ¶¶ 25-35.

Indeed, there is substantial evidence in the record that the Shah's SAVAK was simply repurposed by the IRI (after executing a number of its top personnel) into its own abusive intelligence agency known as SAVAMA. *Id.*, ¶ 27; *see also* Doc. 182-7 at 1 (Washington Post article published on June 7, 1980, reporting that the IRI had "created a new internal security and intelligence operation [called SAVAMA], apparently with a similar organization structure and some of the same faces as its predecessor [SAVAK]"). Several sources indicate that a former high-ranking official in SAVAK, General Hossein Fardoust, "defected to the other side, handed over crucial files, and transformed SAVAK into SAVAMA." Doc. 182-4, ¶ 27; *see also, e.g.*, Doc. 182-7 at 2-4; Doc. 170-111 at 7. To the Iranian people, at least, SAVAMA quickly assumed SAVAK's reputation and remit, deploying similar tactics in its unrelenting persecution of internal dissent. *See* Doc. 182-4, ¶¶ 28-29.

Moreover, the IRI (through SAVAMA and other agencies) has maintained a consistent record of extra-territorial intimidation and violence since the post-revolutionary period, targeting dissidents and political opponents abroad. *See* Doc.

[31] Writing in March of this year, Dr. Nikpour opined that "[t]he culling of the Islamic Republic's political adversaries between 1979-86 along with the 1988 prison massacre represents the most violent period—at least to date—in modern Iranian history." Doc. 182-4, ¶ 34.

182-4, ¶ 36; Doc. 182-12; Doc. 182-13. Some such instances are brazenly violent while others entail more subtle and diffuse methods of intimidation. Plaintiffs point to the IRI's 1991 murder of former Iranian Prime Minister Shahpour Bakhtiar in his home in Paris, France.[32] *See* Doc. 182-13. A French official was quoted at the time surmising that "Iran seems to regard political assassination as its national right, even on foreign soil." *Id.* at 3.

But the IRI makes use of less overt, untraceable means to repress its political and religious opponents abroad, often leveraging its influence over extremist actors.[33] For instance, it is well known (and the Court takes judicial notice of the fact) that author Salman Rushdie, against whom the IRI issued a *fatwa* (or religious edict) calling for his assassination *in 1989*, was—in 2022, over 30 years later—"gravely wounded" during an attack where he was "slashed 15 times" and lost the sight in his right eye. Associated Press, *Man convicted in terrorism trial over the 2022*

[32] A news article reporting on Bakhtiar's murder noted that 6 Iranians had been killed in Paris in the preceding 10 years which authorities had attributed to their political activities. Doc. 182-13 at 5. It also reported FBI officials acknowledging that an Iranian political dissident was murdered in Los Angeles 5 years prior and that the murder had remained unsolved. *Id.* A U.S. State Department report at the time "implicated Iran in a series of murders in Italy, Pakistan and Turkey" and claimed that "Iranian intelligence agents stalk members of the Iranian opposition in the Unted States and throughout the world." *Id.* (internal quotation marks omitted).

[33] Even in the instant lawsuit, Plaintiffs' counsel received a death threat by email which "[t]he FBI traced…to Tehran [Iran]." Doc. 184, ¶ 25; *see* Doc. 182-30; *see also, e.g.*, Philip Oltermann, *Iranian actor Laleh Marzban faces severe threats after Venice film festival speech*, The Guardian (Sept. 18, 2026) https://www.theguardian.com/film/2026/sep/18/iranian-actor-laheh-marzban-venice-film-festival-speech-falling-house (reporting on contemporary Iranian actress being derided by state-associated media as "a two-faced person, […] self-interested, hypocritical, despicable and miserable").

*stabbing of author Salman Rushdie*, NATIONAL PUBLIC RADIO, (July 30, 2026), https://www.npr.org/2026/07/30/g-s1-136257/stabbing-conviction-salman-rushdie; *see* Fed. R. Evid. 201(b). The convicted perpetrator of this attack was reportedly motivated by the IRI's 30+-year-old *fatwa* calling for Rushdie's murder.[34] *Id.*

The most compelling evidence for treating the Shah's regime and the IRI as one in the context of Plaintiffs' equitable tolling argument, however, is that Plaintiffs themselves have been persecuted and denied justice by both regimes. *See supra* at sec. I.(D). Therefore, it is easy to conclude that this unbroken chain of repressive regimes has existed continuously since Plaintiffs' alleged torture in the early 1970s. It is likewise clear that Plaintiffs "could not reasonably have expected to achieve justice" without genuine fear of reprisal while either regime remained in power.[35] *Arce*, 434 F.3d at 1265; *see also* Doc. 180-43 at 214:24-25 (John Doe III

---

[34] *See also* Associated Press, *Man convicted in terrorism trial over the 2022 stabbing of author Salman Rushdie*, NATIONAL PUBLIC RADIO, (July 30, 2026), available at https://www.npr.org/2026/07/30/g-s1-136257/stabbing-conviction-salman-rushdie ("Over the ensuing years, at least 45 people were killed in riots over the book, a Japanese translator was stabbed to death, and an Italian translator and Norwegian publisher were attacked."). A U.S. national security official described the 2022 attack as "a chilling reminder of the global reach of Iranian terrorism[,]" while recognizing that the IRI "has denied involvement in the attack." *Id.* The article reporting on the recent attack also noted that Salman Rushdie, initially following Khomeini's fatwa, "went into hiding for years, gradually emerging after Iran's government distanced itself in 1998 from [the] *fatwa*." But, the article recognized, the *fatwa* was never rescinded and Khomeini's successor "indicated in 2017 that it remained in effect." *Id.*

[35] Plaintiffs have expressed their fears of reprisal against their families and friends in Iran over the years, which courts have also considered pursuant to the fear of reprisal analysis. *See, e.g.*, Doc. 184, ¶¶ 19, 21 [redacted]

testifying that "[t]he fear of the Islamic Republic is always there. That doesn't go away."); *Camps*, 142 F.4th at 751.

**ii. Defendant**

Plaintiffs likewise contend that their fear of reprisal from Defendant himself prevented them from filing suit. *See* Doc. 184 at 37. Along with their contention that his reputation as a torturer invokes substantial distress in its own right, Plaintiffs "believe Defendant retains connections to intelligence agencies, [has] a sophisticated understanding of surveillance and espionage, and [has] a network of supporters willing to follow his directions."[36] *Id.*

In granting Plaintiffs' requests to proceed under pseudonyms in this case, the Court already concluded that "Defendant has had a reputation in public for some time that is closely associated with Plaintiffs' allegations." Doc. 82 at 13-14 (noting Defendant's own acknowledgement that "many things have been written about me…[s]ome have been very critical of me"). Defendant's daughter, a respected medical scientist, has also conceded in interviews that there are "a lot of people

---

[redacted]

Indeed, in *Arce*, the Eleventh Circuit held that only after the Salvadoran military regime fell from power "could the evidence have come to light and [the plaintiff] have made his claims without fear of reprisal against family and friends in El Salvador." 434 F.3d at 1265.

[36] They maintain that "going after Defendant [is] much different and more dangerous than pursuing subordinate SAVAK agents for these [] reasons." Doc. 184 at 37. Plaintiffs insist that "[t]his fear is not abstract[,]" and is "rooted in each Plaintiff's personal experience of torture under the apparatus Defendant led" and in their knowledge of Defendant's standing in the diaspora. *Id.*

who…are saying 'he's a killer,' are saying he's doing all those things." *Id.* at 13 (quoting Doc. 170-93 at 12:00)).

On the surface, therefore, it is not unreasonable that Plaintiffs (who allege that they were subjected to torture by him) would be fearful of pursuing accountability against Defendant in any forum—particularly where Defendant's whereabouts and livelihood were shrouded in mystery. *See, e.g.*, Doc. 170-111 at 7. But Plaintiffs' fear of Defendant is also supported by this Circuit's precedent.

In *Arce*, where the defendants were also high-ranking officials (in the Salvadoran military), the Eleventh Circuit acknowledged the plaintiff's legitimate fear of reprisal "despite the fact that the defendants resided in the United States" (and were not personally exercising any authority) so long as the authoritarian forces remained in power. 434 F.3d at 1264-65. The Eleventh Circuit recognized that "[o]ne would expect [those defendants] to retaliate against any victim (of torture) who sued [them]."[37] *See Arce*, 434 F.3d at 1264-65.

Moreover, unlike the many military defendants in TVPA cases, including *Arce*, Defendant led the Third Division of SAVAK: a highly secretive intelligence agency with connections to other agencies around the world.[38] *See* Doc. 47, ¶ 26; *also,*

[37] Even though in this case SAVAK (the analog here to the Salvadoran military regime in *Arce*) technically ceased to exist after the Revolution, it shares so much in common with its successor agencies that this distinction with *Arce* holds little water. *See* sec. I.(C).

[38] Most precedential cases involved defendants with more rank-and-file military positions than the kind of powerful intelligence role Defendant had here. *See Camps v. Bravo*, 142 F.4th 743,

*e.g.*, Doc. 170-111 at 6; Doc. 170-91 at 131:6-7. While the clandestine nature of these types of connections makes them difficult to prove, there is ample evidence in this record to support Plaintiffs' fears of reprisal arising from Defendant's murky associations with past and present intelligence circles. *See* Doc. 184 at 37.

Defendant's own words in the 2012 VOA interview unequivocally confirmed these associations: "when we were at work, we had professional contact and communication with Mossad and the CIA, exchanging information and cooperating in certain areas."[39] Doc. 182-17 at 3. And a Washington Post article written by investigative journalist Bob Woodward, and published in 1986, further elucidates the shadowy and, at times, inexplicable, landscape in which Defendant, IRI intelligence, the CIA, and other European powers (along with Plaintiffs) existed within.[40] Doc. 182-10.

---

746 (11th Cir. 2025) (defendant Bravo was simply "a commissioned officer in the Argentine military"); quoting *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1151 (11th Cir. 2005) (the defendant was likewise described only as "a Chilean military officer who was alleged to have participated in his execution"); *but see Jean*, 431 F.3d at 777-78 (the defendant was a colonel in the Haitian Armed Forces and chief of personnel).

[39] Defendant even acknowledged that "[s]ometimes some people in the CIA even got annoyed with me." Doc. 182-17 at 3-4. Though he also asserted that he never had any relations with the Mossad or CIA "outside of administrative relations[.]" Doc. 182-17 at 3.

[40] Among other reporting, Woodward's article noted that "it [wa]s well-known" within the Iranian exile community in Paris that their groups had received CIA money. Doc. 182-10 at 1. The CIA reportedly also supported several other exile groups opposing the IRI, in some instances to the tune of "$100,000 a month" (in the 1980s). *Id.* at 2. Yet, at the same time, the CIA reportedly provided the IRI with details of 1-200 suspected Soviet assets within Iran, who were (in large part) subsequently arrested and executed. *Id.* The article contained a statement from a recent former director of the CIA who stated that "[p]laying both sides of the fence is not unusual, as long as they

Plaintiffs' suspicions are well-supported by other record evidence. *See, e.g.*, Doc. 182-4, ¶ 37 (Dr. Nikpour noting that "connections between the erstwhile crown prince and powerful elements in the U.S. and Israeli governments are known across the Iranian diaspora"). In the 2008-published book, Eminent Persians, written by Abbas Milani, the author describes that rumors began as soon as Defendant left Iran: "some said [he was spared] because the CIA wanted him saved." Doc. 170-111 at 7. Indeed, according to Milani's book, "General Fard[o]ust, for many years SAVAK's deputy director, claimed in his vituperative memoir that [Defendant] told him that the CIA was helping him leave Iran." *Id.* Milani concluded that the "real" Defendant "is hidden under a heavy fog of rumor, gossip, innuendo, rightful criticism, and calculated disinformation."[41] *Id.*

In consideration of Defendant's role with SAVAK, the accusations Plaintiffs

---

did not fund any exile group to the extent that they would try to overthrow the [Khomeini] government[,]" which he deemed impossible. *Id.* at 1.

[41] To even further obfuscate Defendant's standing within intelligence circles and with the IRI, Plaintiffs have submitted unrebutted testimony and evidence that his interviews with Fard (dating back to 2008 or 2009) signify at least some level of détente and cooperation with the I.R.G.C. and the IRI—his supposed hunters. *See supra* at note 14. Fard published a book containing his interview "inside Iran with government approval" and Fard continues to work with IRGC-affiliated outlets, despite "establishing ties with Defendant, which [he] has claimed included meeting [him] in person and receiving personal documents and photos from him." *Id.*, ¶ 154; *see also* Doc. 180-43 at 106-09 (John Doe III describing this interview and publication); Doc. 180-17 (John Doe II describing that this interview and memoir indicated Defendant still had real power and was "working with [the IRI] for their organ of revolutionary goal"). Despite multiple opportunities to rebut this evidence, Defendant has never responded to Plaintiffs' assertion. *See* Doc. 67. Nor has he offered any explanation in the instant briefing other than to acknowledge, through his deposition testimony, that he interviewed with Fard. *See* Doc. 170-91 at 98-100.

have made against him, historical support in the record for Defendant's fear-inducing reputation, and his demonstrable connections to clandestine intelligence agencies, it was reasonable for Plaintiffs to fear that reprisal would follow any attempt to hold Defendant accountable for their claims. *See, e.g.*, *Arce*, 434 F.3d at 1264.

**iii. The Monarchists**

Plaintiffs also assert that fear of reprisal from factions of the Iranian diaspora who support the deposed Shah's dynasty played a role in preventing them from bringing their claims forward. Doc. 184 at 36. As demonstrated by the preceding analyses, post-Revolution political relations among Iranians (both in- and outside of the country) are deeply complex, contentious, and, at times, violent—the faction known as the "Monarchists" play a significant role in shaping this narrative.[42] *See supra*.

Generally speaking, the Monarchists seek "the return to power of the Pahlavi family in the form of Reza Pahlavi, the former [S]hah's son." Doc. 182-4, ¶ 37. As described by John Does I and III, however, there is a distinction between some supporters of "the constitutional movement of 1905…[who] accept that [] during

[42] Even Defendant, in previous briefing responding to Plaintiffs' request to proceed pseudonymously, acknowledged that "Plaintiffs *knowingly* filed suit within the context of pre-existing political strife amongst the Iranian diaspora. Their complaint has added to the bitter, partisan discourse online…" Doc. 67 at 5 (emphasis original).

the [Shah's rule], there were mistakes" and the "very extreme elements of the[se] followers."[43] *See, e.g.*, Doc. 180-43 at 102:3-103; Doc. 184 at 9. The extreme elements of this faction have always been active but were less visible before 2022, when they "became very dangerous" as an organized opposition following the "Women, Life, Freedom" movement.[44] Doc. 180-43 at 99-101; Doc. 182-4, ¶ 40 (noting same and citing to a *Politico* article recognizing that "the monarchist movement has in recent years become significantly more 'combative' and willing to use 'slash and burn tactics' against its critics"); *see* Nahal Toosi, "Why Iranians Are Increasingly Willing to Settle for Reza Pahlavi," POLITICO, February 24, 2026, https://www.politico.com/news/magazine/2026/02/24/reza-pahlavi-iran trump-00793877.

John Doe II has feared retaliation from elements of this faction for decades, having been the direct recipient of threats dating back to [redacted], when [redacted]. Doc. 184 at 11. Moreover, John Doe II was confronted by Monarchists constantly

---

43 When the Court refers to the "Monarchist" faction, it is referring to these extreme elements.

44 John Doe III testified that the Monarchists "are much more dangerous than [Reza] Pahlavi himself…I don't feel any fear or danger from him, but I'm in fear of his followers." Doc. 180-43 at 100:4-11. He fears these "radical elements," in part, because they have maintained that during the lead up to the Revolution, the Shah "should have had all the leftist and other opponents of the Pahlavi regime eliminated" and they "support armed actions of the SAVAK and [Defendant]." *Id.* at 105.

while living in [redacted] As a result, John Doe II left [redacted] "because of the threats and hostility he felt from the [M]onarchists there." *Id.*

Defendant ignores this evidence entirely in his papers, claiming that the only evidence Plaintiffs have to support their fear from the Monarchists before 2022 are a few news articles (and essentially conceding that there *has* been good reason to fear them since 2022). *See* Doc. 191 at 12-14. To be sure, the news articles to which Defendant refers clearly support John Doe II's testimony that the Monarchists have been actively stoking fear in the diaspora for decades with their willingness to resort to violence and aggressive conduct. *See, e.g.*, Doc. 182-8; Doc. 182-9; Doc. 182-13 Doc. 182-20; Doc. 185-5. But along with Plaintiffs' unrebutted testimony, those articles are supported by scholarly papers and Dr. Nikpour's Report, which recognize that Monarchists have frequently and consistently clashed with leftist and other opposition movement supporters like Plaintiffs all over the world since the 1980s. *See, e.g.*, Doc. 182-8; Doc. 182-19 at 29; Doc. 182-4.

As previously noted, John Doe III fears the Monarchists because of their outspoken desire to "eliminate" political opponents of the Pahlavi regime, like him. *See supra* at note 44. And John Doe I fears the Monarchists for the same reasons, but

additionally because he "is afraid that elements of the IRI have infiltrated and weaponized the monarchist movement abroad"—a concern which was echoed in Dr. Nikpour's Report. Doc. 184 at 9; Doc. 182-4, ¶ 41 (quoting the aforementioned *Politico* report and noting it is "likely" the IRI has infiltrated the monarchist movement). As Dr. Nikpour described, this fear has been augmented by the recent proliferation of international support for Pahlavi as he and the Monarchist movement appear to be solidifying their opposition to "leftist" agendas. *See* Doc. 182-4, ¶41.

Defendant has presented no evidence to rebut Plaintiffs' proffers.[45] Instead he simply demands that the Court ignore the undisputed facts—supported by Plaintiffs' testimony, Plaintiffs' expert testimony, Defendant's own admissions, and a host of news articles and scholarly works—that Monarchists in the United States and abroad have a demonstrated history of aggressively threatening and harming those who they deem to be opponents of the Pahlavi regime. *See, e.g.*, Doc. 182-20 (a 2018 news article describing a U.S.-based Iranian journalist who went to the police after receiving a wave of death threats and other sadistic threats from Monarchists,

[45] Likewise, his attempt to frame Plaintiffs' fears as having shifted throughout this litigation [redacted] is unavailing. *See* Doc. 191 at 12-13. In fact, Plaintiffs' Complaint always cabined their fear of Monarchists to "factions of the monarchy sympathetic to SAVAK." Doc. 47, ¶ 137. Indeed, in the portions of the Complaint cited by Defendant, Plaintiffs never state that they feared reprisal from [redacted]. *See, e.g.*, *id.*, ¶¶ 137-146.

including against her children, after she published an article criticizing Reza Pahlavi).

Recent events have only served to highlight and affirm the reasonableness of Plaintiffs' fear of the Monarchists. *See, e.g.*, Doc. 182-4, ¶ 39 (Dr. Nikpour recognizing that after Defendant appeared at a rally in 2023 the Monarchist movement reacted by calling him "a living legend and openly thank[ed] him for his work in SAVAK").[46] *Id.* And the Court has already recognized the heinous nature of the threats Plaintiffs have received (largely from the Monarchist faction) since filing this lawsuit in January 2025.[47] Doc. 82 at 7-10.

Even more troubling, the *New York Times* reported that in February this year,

[46] Dr. Nikpour also noted that diasporic television channels "sympathetic to the Pahlavi monarchy…have worked aggressively to whitewash the reputations of the Pahlavi family, SAVAK, and [Defendant] alike." Doc. 182-4, ¶ 39. These channels have produced documentaries about Defendant "hand-waving SAVAK's record of torture and political violence" in which Defendant "disavowed any direct participation or knowledge of torture[.]" *Id.*

[47] For example, one prominent Monarchist—who later communicated directly with Defendant over the phone—posted the following to his X (formerly Twitter) profile on February 25, 2025, after Plaintiffs filed the instant case:

> The first thing we will do in defense of His Excellency Mr. Parviz Khan Sabeti…is to find, through the court in Orlando (Florida), the name, office address, and office phone number of that filthy lawyer who filed this complaint for those three terrorist murderers from the Fedai-Mojahedin…and then, with thousands of fellow Iranians, **we will launch a campaign against him so that his entire life and everything he owns is reduced to ashes**…Then you'll see how that bastard, scammer, greedy lawyer tucks his tail between his legs and runs away! Then we'll go after those three terrorists…and we'll bring upon them the very punishment that SAVAK, due to mercy, honor, and patriotism, did not inflict. **We will take revenge on those three criminals for all the victims of 1978**.

Doc. 82 at 9 (emphasis added).

an Iranian activist named Masood Masjoody ("Masjoody") was found dead in British Columbia, Canada several weeks after filing suit against Reza Pahlavi and other local Monarchist activists for defamation and harassment. Doc. 182-25 at 1-2. Masjoody reportedly warned before his killing that, after falling out with the pro-monarchy movement, "his fellow Iranian activists wanted him dead." *Id.* at 1. Canadian authorities have since charged two Iranian activists—who were both defendants in the case filed by Masjoody—with first-degree murder. *Id.*

Defendant's protest that recent developments like the Masjoody case represent post-hoc rationalization to support Plaintiffs' equitable tolling arguments again misconstrues this analysis. *See* Doc. 191 at 14. The Court does not consider this evidence as conclusive proof that Masjoody was murdered or that Monarchists were responsible or even involved; nor does it rely solely on this evidence to find that the TVPA's statute of limitations should be tolled in this matter. *See supra* at 16-23. This instance is merely persuasive, corroborating evidence for Plaintiffs' well-supported, reasonable fears of reprisal from the Monarchists. *See Cabello*, 402 F.3d at 1156; *see supra* at note 22.

**iv. Tolling Date**

"When a statute is equitably tolled, the statutory period does not begin to run until the impediment to filing a cause of action is removed." *Cabello*, 402 F.3d at 1156; *see also, e.g.*, *Camps*, 142 F.4th at 750-51; *Arce*, 434 F.3d at 1265. "[E]very court

that has considered the question of whether a civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' which toll the statutes of limitations of the…TVPA has answered in the affirmative." *Jean*, 431 F.3d at 780 (collecting cases).

Since Plaintiffs were tortured in the mid-1970s, they have faced continuous threats to their safety whenever and wherever they have attempted to pursue their rights—starting under the Shah, then the IRI, and continuing through the present. *See supra*; *see, e.g.*, Doc. 82 at 7-10 (describing severity of threats directed at Plaintiffs and their counsel since filing this case). Whether from the IRI, Defendant himself, monarchist supporters of Defendant, or shadier elements of the Iranian diaspora, Plaintiffs have faced a legitimate fear of reprisal for seeking accountability for their TVPA claims from every corner—fear that is continuously vindicated by contemporaneously unfolding events like the attack on Salman Rushdie, Masjoody's death, and the threats generated by this case.

Defendant's argument that Plaintiffs' fears are undermined by their continuous activism over the years is misplaced. *See* Doc. 191 at 11-17. Participating "as an anonymous dissident in urban protests supportive of human rights and being one of three plaintiffs in a high-profile case against [Defendant]" are starkly different forms of advocacy. Doc. 184, ¶ 44 (citing John Doe I). And [redacted] activism

never "brought worldwide attention [or an avalanche of threats] to themselves." *See* Doc. 184, ¶¶ 45-51, at 39-40; *see also, e.g.*, Doc. 180-17 at 92:18-20 [redacted].

Defendant's conflation of Plaintiffs' (ultimately toothless) activism over the last four decades with filing a federal lawsuit seeking to hold him accountable in United States federal court for human rights abuses under the TVPA is unconvincing. *See* Doc. 184 at 44 ("This lawsuit is different: it would be expected to, and has, garnered global media coverage and put a target directly on Plaintiffs' backs."); Doc. 180-2 at 215-16 (John Doe I describing that "[i]t is hard to do that kind of stuff. Filing the lawsuit against the person running SAVAK."); Doc. 180-17 at 109:4-12 (John Doe II describing that [redacted] is much, much different than going after that guy."); Doc. 182-43 at 215:4-6 (John Doe III recognizing that "also, perhaps…there is a safety in numbers.").[48]

The Court is careful to consider (and distinguish this case from) the Eleventh Circuit's warning against tolling the statute of limitations where "[m]ere ambient conflict" exists in another country, which followed from a concern that trying claims

---

[48] The fact that Plaintiffs have nevertheless accepted these risks and come forward with their claims anyway only goes to their diligence in seeking justice. *See, e.g.*, Doc. 180-43 (John Doe III testifying that "[y]es…I am [afraid]…[but] this represent[s] a lifetime opportunity for me to…establish that human rights is a concept above everything else."); Doc. 180-2 at 216:17-25 (John Doe I testifying that "[i]t's not for me myself—it's because of your children…Yes. [Filing this lawsuit] [is] for my family, my neighbors, my fellow citizen."); Doc. 180-17 at 87:5-15 (John Doe II testifying that "[t]his—this is a commitment. I cannot [] ignore that. I have fear, especially now…But at the same time, I have to do whatever I believe to do.").

dating back decades presents practical challenges. *Arce*, 434 F.3d at 1265. But the claims in *Camps* (decided barely a year ago) arose in 19[redacted]—precisely the time period in which Plaintiffs' claims arose. 142 F.4th at 745; *see also* Doc. 47, ¶¶ 77 (John Doe I's torture began in 19[redacted]), 87 (John Doe II's torture began in 19[redacted]), 99 (John Doe III's torture and imprisonment began in 19[redacted]). Moreover, the fact that Plaintiffs (who are the torture victims themselves—*ie.* eyewitnesses) and Defendant are alive and able to testify supports the Court's conclusion that the Eleventh Circuit's admonition does not preclude tolling in this case. *See, e.g.*, *Camps*, 142 F. 4th at 745 (the plaintiffs were all "surviving *family members* of four [massacred] prisoners") (emphasis added).

In any event, the IRI has ruled Iran as an authoritarian power without "conflict" since the Revolution; the kind of ambient instability and civil conflict admonished by the Eleventh Circuit is better exemplified in cases like *Jean*. *See* 431 F.3d at 780-83. But even there, it was still proper to toll the statute of limitations until the defendant was removed from power in 1994, despite the Eleventh Circuit recognizing that the defendant had—in 2004, during the pendency of the case—regained power amidst a subsequent violent rebellion. *Id.* Nor did decades of "opposition to efforts to hold the military accountable" constitute an "ambient conflict" in *Camps*, despite the fact that a democratic government came to power in 1983—decades prior to the 2008 tolling date. 142 F.4th at 750-51; *Camps et al v. Bravo*,

No. 1:20-cv-24294-LFL, Doc. 180 at 17-18 (S.D. Fla. June 30, 2023) (hereinafter *Bravo*); *see Arce*, 434 F.3d at 1265.

The district court in *Camps* (whose findings in this regard were upheld by the Eleventh Circuit) noted that evidence of ambient conflict (reports of witness intimidation in the 2010s) could not support tolling after 2008. *Bravo*, No. 1:20-cv-24294-LFL, Doc. 180 at 19. But that finding was predicated on the emergence of a democratic government and the holding "that [the] oppression [wa]s not ongoing." *Id.* at 17, 19. That foundation simply does not exist in this case. Though the facts underlying Plaintiffs' claims arose over 50 years ago, binding precedent indicates that their claims can still be reasonably tried. *See Camps*, 142 F. 4th at 751 (approving equitable tolling until 2008 for claims that arose in 1972 and thus permitting suit if filed by 2018).

As is plainly demonstrated by the record evidence, Plaintiffs' fear of reprisal is ongoing—therefore the clock on the TVPA statute of limitations has not even begun to run and their lawsuit was timely when filed. *See Cabello*, 402 F.3d at 1156; *see also, e.g.*, *Jean*, 431 F.3d at 781-83. While Defendant steadfastly opposes this conclusion, he has presented no evidence to rebut it—nor has he proposed a reasonable alternative date for when the statute of limitations should have begun

considering Plaintiffs' fears of reprisal.[49] *See* Doc. 180; Doc. 191.

**b) Concealment**

In addition to their fear of reprisal, Plaintiffs also argue that Defendant's concealment of his whereabouts until 2023 constitutes an extraordinary circumstance. Doc. 184 at 40-43. Defendant counters that because his name has appeared over 200 times in the public record since the 1980s, there is no concealment and that Plaintiffs' claim "is an improper attempt to shift the blame for their late filing to [Defendant]." Doc. 180 at 44; *see also* Doc. 191 at 6-9.

At the outset, there is no factual dispute that Plaintiffs did not know Defendant's whereabouts before 2023. *See* Doc. 180 at 2; *see also, e.g.*, Doc. 184 at 23, n. 8; Doc. 191 at 7, n.7; Doc. 182-49. And Defendant concedes that he was concealing himself from at least 1979 to 1984. Doc. 180, ¶ 38; *cf. id.*, ¶¶ 39, 45; Doc. 190-1 at 5. Indeed, Defendant acknowledges that during his first year in the United States he lived in New Jersey and Hawaii—and only left Hawaii because he was recognized by an Iranian. *Id.*, ¶¶ 40-41. After relocating to Ormond Beach, Florida, he and his

---

[49] The Court notes Defendant's unprofessional assertion in his Motion that the statute of limitations "began to run in 19[redacted] for John Doe I and John Doe II and 19[redacted] for John Doe 3." Doc. 180 at 30. First, Defendant conceded in the same Motion that he was in hiding through 1984. *See* Doc. 180, ¶ 38. Moreover, Defendant went so far as to (wrongly) admonish Plaintiffs for correctly stating that the statute of limitations does not begin to run for their 1970s claims until at least 1992, when the TVPA was enacted—which was stated plainly by the Eleventh Circuit barely a year ago. *See* Doc. 191 at 1, n.3; *Camps*, 142 F.4th at 749-50 ("Claims brought under the TVPA are subject to a ten-year statute of limitations…[t]he plaintiffs therefore had to bring their claims—at the latest—by March of 2002, ten years after the enactment of the TVPA.").

family again moved to Georgia for eight months because they had come home "to find their door open." *Id.*, ¶ 42.

Defendant testified that he "maintained a low profile" during those years "because the [IRI] was hunting him." *Id.*, ¶ 38. But he also swore in an affidavit earlier in this case that he has "lived under constant threat of reprisal" and lives with "ongoing security threats against [his] family[.]" Doc. 55-1, ¶ 21. Although Defendant insisted in his affidavit that despite the constant threats to his life and the safety of his family, "[he] ha[s] lived openly and publicly in the United States[,]" the undisputed record shows that he undertook significant and effective methods to conceal himself before 2023. *See id.*, ¶ 23.

This record includes the following undisputed facts: Defendant admits he has never held title to real property in the United States;[50] Defendant has used a false residential address on his driver's license since at least 1990;[51] Defendant used a false address on his 2016 voter registration card;[52] Defendant has used an altered

[50] *See* Doc. 170-91 at 89:24-90:2.

[51] Defendant's assertion that this practice is somehow normal simply because he had a car accident and thought it would be a superior way to notify his family does nothing to detract from the fact that he admits he has used a false address on his official government ID since 1990. *See* Doc. 184, ¶ 55; Doc. 191 at 7, n.9.

[52] *See* Doc. 185-14; Doc. 170-91 at 82-83.

date of birth as his legal birth date since he was in his 20s;[53] Defendant has gone by the nicknames "Mark" and "Peter" at various times;[54] Defendant's wife has used the last name "Sabetini" for business purposes;[55] and his daughter, Dr. Sabeti, has very persuasively supported the narrative that Defendant concealed himself until 2023. *See* Doc. 191 at 7-8; Doc. 184, ¶¶ 54-64; Doc. 170-91 at 109.

In a November 2, 2024, podcast interview, Dr. Sabeti was asked about what her childhood was like and whether people asked her about her father, given his reputation and history with SAVAK. Doc. 170-93 at 5:32-7:20. In response, she stated unequivocally that, "[f]or one, people didn't say that much to us **because we didn't really talk about it, we were in hiding**…we moved from state to state, changed our names multiple times…there are *still* obviously always risks." Doc. 91 at 7:20-7:46 (emphasis added). She also stated that Defendant has never stopped "fight[ing] for Iran" but confirmed that her "dad hasn't come out, he hasn't spoken." *Id.* at 8:05-

[53] The Court acknowledges that this particular fact is consistent, at least, across his forms of identification, but again underscores Defendant's penchant for concealing his true biographical information when advantageous to him. *See* Doc. 184, ¶56, n. 4; Doc. 191 at 7, n.9.

[54] The Court accepts Defendant's explanation that it is common for immigrants to choose an anglicized nickname, so this fact is not indicative of concealment standing alone. *See* Doc. 180, ¶ 52. But taken in context with the rest of the record, the fact that Defendant went by Mark when he first moved to the United States but then changed that nickname to Peter when he became a U.S. citizen in 1993 also serves to support the contention that Defendant continuously took steps to obfuscate his true identity, using various aliases when convenient. *See id.*; Doc. 184, ¶ 57. That his wife and daughters have lived under different names, while innocent standing alone, also lends credibility to the air of mystery and confusion regarding who the Sabetis (or Sabetinis) were. *See* Doc. 184, ¶¶ 58.

[55] *See, e.g.*, Doc. 182-34.

8:23. Indeed, she discussed in the plainest terms that "[Defendant] **recently kind of came out of the woodworks** when we—my mom—brought him to a—we went to a protest…my mom was the architect, **she waited 44 years to try to do this**." *Id.* at 8:54-9:08 (emphasis added).

To rebut Plaintiffs' assertions of concealment, Defendant relies almost exclusively on a slate of documents that have existed in the public record since 1985. *See* Doc. 180 at 44-45; Doc. 191 at 6-9; *see also* Doc. 180, ¶¶ 46. These public records include mortgage documents, corporate filings, power of attorney documentation and records associated with a 1990 car accident he was involved in. Doc. 180, ¶ 46. However, the vast majority of these public records date to the 1980s and 1990s, which Defendant concedes were not readily accessible online until at least 2004. *See* Doc. 180, ¶ 49.

Defendant points to several instances around the early 2010s where he was, for the first time, associated with living in Florida—but these were limited mentions in materials which were not widely disseminated. *See* Doc. 180, ¶¶ 54-56. A May 4, 2012, article from *Tehran Bureau* (associated with PBS) suggested Defendant "live[d] in Florida in exile, where he ha[d] been active in business." Doc. 170-113. In 2014, Defendant's Wikipedia page (which consisted of five poorly sourced sentences) also listed that he had "settled in Florida[,]" however the only source for that statement was an Iranian article titled "Meet the 'Beast of SAVAK' " and which the Court has

been unable to locate. *See* Doc. 170-114. These kind of unsubstantiated claims have generally been met with skepticism by the diaspora and largely served only to fuel "Iran's complicated conspiratorial cosmos[.]" Doc. 170-111 at 285; *see also generally* Doc. 182-19 at 22-44.

The only other indications that Defendant might be living in Florida came from several news articles about Defendant's daughter, published in 2008, 2012, and 2013 (which were from limited-circulation scientific publications), and her Wikipedia page (based on those articles). *See* Doc. 170-116; Doc. 170-117; Doc. 170-118; Doc. 170-119. Notably, however, Defendant himself identified false information throughout his Wikipedia post and testified that "everybody can put anything in Wikipedia[…][i]t doesn't mean it's a true document." Doc. 170-91 at 25:6-29:10.

Moreover, a noticeable characteristic emerges from Defendant's public records evidence: as such documents became more readily accessible to the public in the 2000s and 2010s with the widespread adoption of the Internet, he discernibly curtailed his practice of regularly appearing in the public record.[56] *See, e.g., id.* In fact, Defendant essentially disappears from official public records beginning in 2012 (no more mortgage documents, no power of attorneys, no corporate filings, no liens,

[56] Indeed, Defendant listed himself in the annual corporate filings of five different corporations every single year beginning in 1995 (or 1996, in the case of one corporation) but he did not appear in any after 2011. Doc. 170-120; Doc. 170-121.

not even any traffic infractions)—which conspicuously coincides with his appearance in the VOA interview and the publishing of his other interviews. *See, e.g.*, Doc. 180, ¶¶ 46, 54; *see also* Doc. 170-120. Apart from a handful of political donations—which are not commonly accessible information—Defendant does not appear in the public record after 2012.[57] *See, e.g.*, Doc. 180, ¶¶ 46, 54.

Plaintiffs raised this conspicuous transformation in their Response to Defendant's motion for summary judgment, but he offered no reply whatsoever. *See* Doc. 191 at 6-9. Instead, he hangs his entire argument on the assertion that his name appears "at least 250 times in publicly available documents in the joint record alone, spanning 1985-2022." *Id.* at 6. But what Defendant does not say is that the vast majority of these records were not easily accessible when they were filed and that his name appears only *seven* times on public record documents after 2012—and those were only associated with a handful of political donations which listed a P.O. Box in Orlando as his address. *See id.* (citing Doc. 170-107; Doc. 170-108); Doc. 170-103.

When considered in conjunction with the foregoing analysis, Defendant's retreat from the public record as soon as he appeared in the press a few times in the early 2010s is persuasive evidence that he was taking steps to conceal himself.

[57] Defendant also made three appearances in 2012-13 at speeches and awards for his daughter, but there would be no reason for anyone involved in those events to recognize or publicize Defendant's presence. *See* Doc. 170-107 at 4.

Indeed, an interview with Defendant published in 2023 (shortly after his reemergence) by Timeline Iran provides even stronger support—the interview began with the host's acknowledgement that "**[a]t the time [of the interview in 2014], [Defendant] did not wish to have his image shown for security reasons**, but has since made several public appearances, so we felt it appropriate to share this interview with you now." *See Inside the Shahs Shadow: A Conversation with Parviz Sabeti*, TIMELINE IRAN, (interview conducted 2014, published Dec. 4, 2023), https://www.youtube.com/watch?v= t0FL7MMUrY4.

Once again, *Camps* is instructive here. The Eleventh Circuit affirmed the district court's finding there that the plaintiffs were unable to locate the defendant until 2008 which, "in conjunction with fear of reprisal, appropriately tolled the statute of limitations until…2008." *Bravo*, No. 1:20-cv-24294-Louis, Doc. 180 at 20. Indeed, it opined that it seemed "reasonable to us that if Argentina was unable to locate [the defendant] until receiving information from Interpol, the plaintiffs could not find him before then either." *Camps*, 142 F.4th at 751. Plaintiffs suggest that the same logic applies to this case. Doc. 184 at 42-43. Defendant, however, complains that there "is no comparable obstacle here."[58] Doc. 191 at 7.

---

[58] Defendant argues that Plaintiffs' speculation that "the IRI could not locate Defendant" has no support. *See* Doc. 191 at 7. However, throughout this litigation—from his resistance to Plaintiffs proceeding pseudonymously to his present motion for summary judgment (and further supported by his daughter's public interviews)—Defendant has said that the IRI "was hunting him" and that he "live[s] under constant threat of reprisal[.]" Doc. 180, ¶¶ 33, 38 (Defendant citing

Upon closer examination, however, the similarities between Defendant here and the defendant in that case, Roberto Guillermo Bravo ("Bravo"), are stark.[59] Both Bravo and Defendant obtained United States citizenship. *See Bravo*, No. 1:20-cv-24294-Louis, Doc. 180 at 20. Like Defendant, Bravo fled to the United States "to make it harder for him to be found." *Id.* at 21; *see* Doc. 180, ¶ 38. And, crucially, Bravo "bought and sold property and opened businesses in Florida under his own name"—presenting nearly identical public records evidence to that which Defendant relies upon here. *Bravo*, No. 1:20-cv-24294-Louis, Doc. 180 at 20.

While the plaintiffs in that case—like Plaintiffs here—testified that they did not know Bravo's location, a distinguishing factor for the district court was that some of the plaintiffs testified that they additionally did not know Bravo's first name until Argentina publicized his criminal prosecution. *Id.* at 20. The district court acknowledged, however, that at least one of the plaintiffs (Krueger) knew Bravo's full name, but ultimately credited her fears of reprisal and the fact that she did not know where Bravo was as overriding considerations. *Id.* Given Plaintiffs' comparable (and ongoing) fear of reprisal here, a similar approach (which was

---

to Dr. Nikpour's testimony that "from the 1990s through the 2020s, the [IRI] would 'absolutely' have executed Defendant if they were able to capture him"); Doc. 55-1, ¶ 21; *see also* Doc. 170-93 at 7:45-:50 ("There's still obviously always risks.").

[59] Without explanation, Defendant contends *Camps* militates in favor of his argument because of Bravo's "actual concealment"—but he is noticeably silent regarding the obvious similarity between the evidence he has presented and Bravo's. *See* Doc. 191 at 7.

affirmed in *Camps*) should apply. *See supra*. Moreover, Plaintiffs never had the benefit of an Iranian criminal prosecution from which to learn Defendant's whereabouts, like the plaintiffs did in *Camps/Bravo*.[60]

Defendant openly admits he concealed himself for some time when he first arrived in the United States and the record is undisputed that he took substantial steps to continue concealing his whereabouts until 2023, when he "recently kind of came out of the woodworks." *See* Doc. 170-93 at 8:54-9:08; Doc. 182-23 ("[Defendant] resurfaced publicly during Iran's widespread 2022 protests after decades out of view."); *Camps*, 142 F.4th at 751; *Bravo*, No. 1:20-cv-24294-Louis, Doc. 180 at 20-21. While the Court appreciates that Defendant may "dispute" the finding that he "concealed" himself, whether he has done so is a legal conclusion, not a factual matter, and cannot defeat summary judgment. *See, e.g.*, *Camps*, 142 F.4th at 751; Rule 56(c). Even if Plaintiffs' fears of reprisal are discounted, Defendant's concealment is a distinct extraordinary circumstance which justifies tolling the statute of limitations until at least February 11, 2023. *See* Doc. 182-49 at 2.

**D. Diligence**

The Court begins by acknowledging the applicable legal standard. Defendant is correct that whether extraordinary circumstances "are unavoidable even with

---

[60] Plaintiffs have also presented substantial evidence of Defendant's deliberate actions taken to conceal himself, which the plaintiffs in *Camps* did not have. *See supra*; *Camps*, 142 F.4th at 751; *Bravo*, No. 1:20-cv-24294-Louis, Doc. 180 at 20-21.

diligence" is a distinct "element" of the equitable tolling analysis. *See, e.g.*, Doc. 191 at 2; *Menominee Indian Tribe of Wisconsin v. U.S.*, 577 U.S. 250, 256 (2016). "The general test for equitable tolling requires the party seeking tolling to prove '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.' " *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016).

But Defendant focuses on an illusory dichotomy that is ultimately not dispositive—yes, the diligence requirement is a distinct element that considers "those affairs within the litigant's control[,]" but *Camps* (decided nearly a decade after *Menominee* and *Villareal*) confirms that diligence is obviously still analyzed in the context of the facts of the case.[61] 142 F.4th at 751; *Menominee*, 577 U.S. at 257. Defendant's assertion that the diligence element should be analyzed in a vacuum where there can be no acknowledgement of extraordinary circumstances has no support in TVPA (or other) jurisprudence.[62] *See* Doc. 191.

---

[61] In *Camps*, the Eleventh Circuit held that "equitable tolling" appropriately tolled the statute of limitations through 2005 and 2008. 142 F.4th at 751. Before doing so, it explicitly analyzed the plaintiffs' diligence in attempting to pursue their rights over the decades within the context of the extraordinary circumstances they faced. *Id.* ("Mr. Cappello's grandparents also attempted to file a lawsuit related to their son's death. That resulted in the regime 'disappearing' Mr. Cappello's mother, father, brother, and the lawyers representing his grandparents."). If that were not clear enough, "equitable tolling" includes the elements of extraordinary circumstances *and* diligence, so if the Eleventh Circuit found that "equitable tolling was appropriate[,]" it necessarily did so by finding the presence of both elements. *See id.*

[62] Defendant's misplaced reliance on cases like *Villareal* ignores the factual and legal distinctions between these cases. *See* Doc. 180 at 31 (citing *Villareal*, 839 F.3d at 961, 972, for the

Additionally, Defendant's attempt to erect a bright-line diligence standard—one which considers a plaintiff's efforts to find their alleged torturer as the sole relevant evidence of diligence—in place of the broad standard that actually exists is unavailing. *See* Doc. 191; *Villareal*, 839 F.3d at 971. Plaintiffs are correct that diligence is analyzed only *after* the extraordinary circumstance has abated. *See, e.g.*, *Cabello*, 402 F.3d at 1155-56 ("The information regarding the circumstances and manner of Cabello's death was not discoverable or knowable until 1990; therefore, the 1999 filing of this claim was timely."); *NuVasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 875-76 (11th Cir. 2023) (non-TVPA case) ("The record provides ample support for the district court's findings that [the plaintiff] acted quickly once it learned about the text messages."); *Menominee*, 577 U.S. at 257 ("the diligence prong…covers those affairs within the litigant's control").[63]

---

proposition that a plaintiff was not diligent because he "did nothing for more than two years" after filing a job application until lawyers contacted him to discuss filing a claim arising from those facts). Analyzing "those affairs within the litigant's control[,]" a plaintiff sitting on his rights to claim employment discrimination associated with a job application looks nothing like an alleged torture victim who has not filed a TVPA lawsuit for decades out of fear of reprisal or inability to locate defendants or evidence. *See Camps*, 145 F.4th at 750-52. Stark juxtapositions like this one likely informed the Eleventh Circuit's direction to "look to the relevant statute for guidance in determining whether equitable tolling is appropriate in a given situation[,]" *Arce*, 434 F.3d at 1261, and subsequently, its acknowledgement that the TVPA "explicitly calls for consideration of all equitable tolling principles…with a view toward giving justice to plaintiff's rights." *Camps*, 142 F.4th at 750.

[63] Importantly, *Menominee* and *Villareal* did not overrule the diligence holding in *Cabello*—those cases merely stand for the proposition that diligence is analyzed as a distinct element. *See supra*. In any event, *NuVasive*—decided nearly a decade *after* those cases—confirms not only that the diligence prong is analyzed in connection with the extraordinary circumstances prong, but that the plaintiff's diligence in pursuing their rights is only analyzed after the impediment to bringing

Plaintiffs' legitimate fear of reprisal is ongoing and it is clear that no amount of diligence could have mitigated those circumstances. *See, e.g.*, *Menominee*, 577 U.S. at 257. Even if it were analyzed earlier, however, Plaintiffs' have been reasonably diligent (in the face of lifelong death threats and other harassment) in their pursuit of justice for the claims they have brought in this lawsuit. *See* Doc. 180 at 8-12; *see, e.g.*, Doc. 180-43 at 84:9-17 (John Doe III stating that, "since 1981 [he] has been an activist in relation to human rights…[s]ince torture has existed in both regimes and the previous regime and—and the current one, I have referenced both regimes whenever there's—I had a chance to voice my concerns and—and speak against torture.").

As soon as Plaintiffs, along with the rest of the Iranian diaspora, learned Defendant was in the U.S. when "he came out of the woodwork" in 2023, they "promptly found each other, located Defendant in Florida, and commenced this action" less than two years later (well within the ten year period prescribed by the TVPA). Doc. 170-93; Doc. 184 at 43; *see also* Doc. 1; *Camps*, 142 F.4th at 749-50.

However, Defendant insists that because Plaintiffs admit that they did not look for him prior to 2023, they have *per se* not been diligent. *See* Doc. 180; Doc. 191. But as demonstrated in *Camps*, seeking out the location of individuals accused of

---

suit is resolved. *NuVasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 875-76 (11th Cir. 2023). Tellingly, Defendant did not respond to Plaintiffs' citation to *NuVasive* for this proposition. *See generally* Doc. 191.

human rights abuses who have remained hidden from their alleged victims greatly exceeds "reasonable diligence" in the TVPA context. 142 F.4th at 751; *Dotson*, 30 F.4th at 1260. In *Camps*, one of the plaintiffs (a relative of the victim) simply did not know Bravo's (the defendant's) whereabouts (despite knowing his full name) and moved to South Africa to get away from threats—neither the district court nor the Eleventh Circuit suggested that plaintiff should have searched out and found Bravo, much less that they were not diligent for failing to do so. 142 F.4th at 751, 754-55; *Bravo*, No. 1:20-cv-24294-Louis, Doc. 180 at 23-25.

On the contrary, the Eleventh Circuit summarily approved of that plaintiff's diligence despite the fact that she made no attempt to search for him—which is identical to the Plaintiffs' conduct here. 142 F.4th at 751; *see, e.g.*, Doc. 191 at 6. Instead, it recognized that those plaintiffs' attempts to seek justice over the decades had generated threats and actual violence against them and that their letters advocating for justice, along with their more contemporary participation in criminal and other proceedings in Argentina (decades after a democratic government regained power), were sufficient to satisfy the diligence prong.[64] *Camps*, 142 F.4th at 751

[64] Indeed, the Eleventh Circuit remanded the case because it recognized that the district court's finding that one plaintiff was not diligent was likely incorrect. *See* Doc. 191 at 5; *Camps*, 142 F.4th at 753-55. And in that case the plaintiff in question was the nephew of the actual victim so his diligence was largely cabined to his actions in the Argentinian proceedings in a representative capacity. *Camps*, 142 F.4th at 753-55.

As John Doe II explained, his fear of pursuing Defendant was "like, when [a] deer save[s] itself from [the] mouth of [a] wolf, it doesn't go back to look for the wolf."[65] Doc. 170-17 at 241. That fear notwithstanding, Plaintiffs have each taken their own risks to stand by their allegations and diligently advocate for justice via the limited affairs within their control.[66] *See* Doc. 180 at 8-12; *Menominee*, 577 U.S. at 257.

Plaintiffs, who arrived in this country as refugees and still do not feel safe here, cannot have been reasonably expected to engage in any greater diligence.[67] *See, e.g.*, Doc. 180-2 at 215:23-216:16; Doc. 180-17 at 190:15-191:1; Doc. 180-43 at 96:10-97:10. On top of their (vindicated) fears of reprisal preventing them from searching for Defendant, they would have had no reliable indication where to deploy their

---

[65] Again, it is undisputed that Plaintiffs' fear of reprisal was the primary cause of their delay in bringing suit. *See supra* at note 30.

[66] [redacted] John Doe II was not scared of them, but he *was* scared of Defendant. Doc. 180-17 at 182:15-187:13; 193:5-14 (discussing that suing Defendant, because of his power, is "much different than other interrogator[s], torturer[s], or other officials, SAVAK key officials" [redacted].

[67] *See, e.g.*, Doc. 180-43 at 136:22-137:14 (John Doe III testifying that "it was not possible for me to think that the—any country, with the reputation that Sabeti had, similar to Nazi tortures, would have allowed him in and given him residence…[an]d that even if he was someplace in the world, he would have been under fictious identity. I still felt humanity is alive."). Indeed, it is entirely reasonable that Plaintiffs could not imagine that Defendant could have spent the last 40+ years living in the United States given its obligations under international human rights agreements to investigate alleged torturers. *See supra* at 14; *Arce*, 434 F.3d at 1261-62.

limited resources until 2023 due to Defendant's concealment. *See, e.g.*, Doc. 180-2 at 127:2-128:16; Doc. 180-17 at 28:1-12; Doc. 180-43 at 6-10. A few allusions in niche publications and unsupported speculation in the 2010s—largely from Wikipedia entries, which Defendant himself admits are not trustworthy—cannot support a finding that Plaintiffs should have known where he was. *See, e.g.*, Doc. 180-43 at 141:20-145:9 ("Pardis Sabeti could be anyone…I had no reason to be looking for Ms. Pardis, and it all contradicts also with the fear that I have of looking for Parviz Sabeti"); Doc. 170-91 at 25:6-29:10.

Once there was a reliable indication that Defendant was located in the United States, Plaintiffs—now in their 70s and 80s—determined this might be their only chance to seek justice for their claims and so resolved to accept the lethal risks that have accompanied their decision to file this lawsuit. *See, e.g.*, Doc. 180-2 at 132:14-16; Doc. 180-17 at 87:5-15, 190:15-191:1; Doc. 180-43 at 212:17-213:9, 210:19-211:24. Plaintiffs have been sufficiently diligent to justify equitably tolling the TVPA's statute of limitations until at least 2023. *See id.*; *Dotson v. U.S.*, 30 F.4th at 1260.

## III. Conclusion

> Congress enacted the TVPA "to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights ...." Pub. L. No. 102–256, 106 Stat. 73. Absent a cause of action in the United States courts, some of the most egregious cases of human rights violations might go unheard because regimes that commit the most serious human rights abuses

> often possess the most woefully inadequate legal mechanisms for redressing those abuses. Congress recognized this problem in enacting the TVPA[.] … This court must therefore apply equitable tolling to ensure that abuses occurring abroad do not thwart the fair administration of justice in the courts of the United States.

*Arce*, 434 F.3d at 1261-62.

Considering that Iran has never engaged in a democratic reckoning of the crimes Defendant is accused of (unlike Argentina in *Camps*, or El Salvador in *Arce*, or Haiti, in *Jean*, or Chile, in *Cabello*), Plaintiffs' fear of reprisal from a myriad of dangers—coupled with Defendant's concealment—clearly establish the extraordinary circumstances required to support equitable tolling. Moreover, Plaintiffs' diligent support of human rights movements and accountability for injustice signals the seriousness with which they have pursued their rights. "This case…exemplifies the kind of 'extraordinary circumstances' that, in the interests of justice, require equitable tolling." *Arce*, 434 F.3d at 1265.

* * *

As the Court recognized in its Order allowing Plaintiffs to remain pseudonymous through the equitable tolling phase of these proceedings, now that the case is progressing they "will be required to share their identities with Defendant for discovery on the merits of their claim." Doc. 82 at 18, n.13. For absolute clarity, however, the Protective Order currently in place—which prohibits

Defendant's knowledge of Plaintiffs' identities—remains binding and in full effect until an Amended Protective Order is adopted.[68] Doc. 119-1 at 9, 14-15.

Accordingly, it is **ORDERED** that:

1. Plaintiffs' Request for Judicial Notice (Doc. 183) is hereby **GRANTED**;
2. Defendant's *Daubert* Motion to Exclude Expert Testimony of Golnar Nikpour (Doc. 192) is hereby **GRANTED in part** as to any legal conclusions in the Report but is **DENIED** in all other respects;
3. Defendant's Motion for Summary Judgment (Doc. 180) is hereby **DENIED** and Summary Judgment is hereby **GRANTED** in favor of Plaintiffs on the issue of equitable tolling;
4. The TVPA's statute of limitations has yet to begin running on Plaintiffs' claims—and even if it has, it is hereby **EQUITABLY TOLLED until at least February 11, 2023**—rendering them **TIMELY**.
5. The parties are hereby **DIRECTED** to submit their proposed Amendments to the Protective Order (Doc. 119-1) to facilitate

[68] In keeping with its findings regarding Plaintiffs' fears of reprisal and the well-documented catalog of violent threats arising from this case, the Court notes that any violations by Defendant of the amended protective order, once issued, will be treated with the utmost concern and all remedies—including default judgment—will be considered.

Defendant's knowledge of Plaintiffs' identities as this case proceeds to discovery on the merits of Plaintiffs' TVPA claims; and

6. The parties are further **ORDERED** to submit a revised Case Management Report **on or before October 23, 2026**.

7. Finally, the instant Order has been filed under seal to protect Plaintiffs' identities pursuant to the Protective Order (Doc. 119-1). The parties are directed to **CONFER** and **NOTIFY** the Court which segments, if any, of this Order should be redacted before it is published on the public docket **on or before October 16, 2026.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 6, 2026.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party